**UNITED STATES of America**

**v.**

**Charles MAYNARD, Appellant.**

**UNITED STATES of America**

**v.**

**Kermit N. GILBERT, Appellant.**

**Nos. 24938, 24939.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 10, 1972.

Decided March 26, 1973.

---

Ruth L. Prokop, Washington, D. C. (appointed by this court), for appellant in No. 24,938.

Preston Brown, Washington, D. C. (appointed by this court), for appellant in No. 24,939.

James A. Adams, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty., at the time the brief was filed, John A. Terry and Richard N. Stuckley, Asst. U. S. Attys., were on the brief, for appellee. Harold H. Titus, Jr., U. S. Atty., and John F. Evans, Asst. U. S. Atty., also entered appearances for appellee.

Before BAZELON, Chief Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

BAZELON, Chief Judge:

Charles Maynard and Kermit Gilbert were jointly tried and convicted of the assault and armed robbery of one Paul Gueory.[1] During the course of their trial, evidence was admitted that Maynard's sole defense witness, Mrs. Constance Kemper, had been charged with obstruction of justice for her alleged efforts to persuade Gueory not to identify her brother, the appellant Gilbert. On the grounds that the admission of this evidence was error and worked substantial prejudice to Maynard's defense, we reverse Maynard's conviction.

Gilbert contends that handwritten notes taken during a police interview of Gueory should have been available to his

---

1. Maynard was convicted of armed robbery, 22 D.C.Code §§ 2901, 3202 and assault with a dangerous weapon, 22 D.C.Code § 502. Gilbert was convicted of assault with intent to kill while armed, 22 D.C. Code §§ 501, 3202, armed robbery, 22 D.C. Code §§ 2901, 3202 and assault with a dangerous weapon, 22 D.C.Code § 502.

defense under the Jencks Act, 18 U.S.C. § 3500 (1970), and Brady v. Maryland.[2] These notes were delivered to the United States Attorney's office, but were unavailable at the time of trial. Since the record fails to disclose the reason for their disappearance, or any inquiry into the effect thereof, we remand Gilbert's case for a hearing to develop these facts and to consider the issues raised under the Jencks Act, *Brady*, and this court's decision in United States v. Bryant.[3] In addition, we direct the trial court to consider whether the impeachment of Constance Kemper through reference to her arrest for obstruction of justice was prejudicial error as to Gilbert.

The reasons for our decision follow.

## I.

The relevant facts concerning the crimes for which Maynard and Gilbert were charged, as told by the victim Gueory, are as follows: [4]

Around noon on October 18, 1969, as Gueory was returning to his rooming house at 1775 T Street, N.W., he overheard that a group of men on the street was looking for one Earl Robinson who resided at the same address. Gueory recognized the appellant Gilbert, although he did not then know him by name,[5] as being among the group discussing Robinson.

As soon as Gueory reached his room and opened his window, someone in the street group fired a shot in his direction. Gueory spent the rest of the day in his room with his girlfriend Doris Green and other friends, and admitted shooting heroin at ten or eleven at night. At approximately one in the morning of October 19, Gueory left his room to go to the Manhattan Bar on the corner of Eighteenth and T streets. As he crossed an alley on Eighteenth, Gil-

bert and another man approached him. Gueory wanted to tell them that he had nothing to do with Earl Robinson, but was hit by Gilbert with a gun and was attacked by three other men all carrying weapons. One of these men robbed him of the cash he was carrying. Gilbert threatened to kill Gueory, while Gueory continued to deny that he had anything to do with Earl Robinson.

The four assailants forced Gueory back to his rooming house and he showed them the room belonging to Robinson. As the attacker whom Gueory later identified as the appellant Maynard kicked open Robinson's door, Gueory attempted to climb the stairs to his own room. He heard Gilbert yell "Where in the hell do you think you're going?" and was immediately struck in the legs by a shotgun blast. He continued to crawl up the stairs and was helped into his room by Doris Green.

To this story, Doris Green added only that she had identified Gilbert sitting in front of the rooming house around midnight on that evening and that she knew her cousin, Earl Robinson, had taken something belonging to Gilbert.[6] After Gueory was shot, she escaped from the rooming house via a bathroom window and telephoned for an ambulance. Gueory was taken to Freedman's Hospital.

## II.

The Government's case against the appellant Maynard rested solely on the identification of Maynard by Gueory and Gueory's testimony concerning a conversation he held with Maynard while still in the hospital.

Gueory testified that he by chance recognized Maynard, whom he did not know before the attack, when Maynard was visiting another patient in Freedmen's Hospital. At the time, Gueory re-

---

2. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

3. 142 U.S.App.D.C. 132, 439 F.2d 642, aff'd after remand 145 U.S.App.D.C. 259, 448 F.2d 1182 (1971).

4. Transcript at pp. 113–186. Unless otherwise noted, citation to Transcript will refer to the dates of the trial, September 24, 25, 28, 29, 1970.

5. Transcript at p. 65.

6. Transcript at pp. 200–208.

ported this to no one, but several days later Maynard again visited the hospital, this time in the company of a woman who identified herself to Gueory as being Gilbert's sister, Constance Kemper.[7]

According to Gueory's testimony, the sister proceeded to show him a picture of Gilbert and asked him not to identify the picture if the police showed it to him. She told him that if he agreed, he would be well taken care of, that she would bring some "goodies" or "five green apples" which Gueory understood to mean money.

Gueory further testified about a bedside conversation he held with Maynard, which proceeded substantially as follows: Gueory accused Maynard of being one of his assailants, which Maynard denied. Thereupon Gueory said to Maynard "You had a .45, didn't you?" to which Maynard replied no, he had a .38. Gueory stated that he could have Maynard arrested right then, and Maynard replied, "Yeah, I know you can." Gueory then told Maynard that he had no animosity and did not want to press any charges.

After his release from the hospital, Gueory made a full statement concerning this visit to Detective Dean Caldwell, who had been questioning him since the shooting. Maynard was arrested on November 21, 1969.

At trial, Maynard did not take the stand to testify in his own behalf. His primary defense witness was Gilbert's sister, Mrs. Kemper, who contradicted Gueory's version of the events at the hospital bedside.[8] Mrs. Kemper stated that Gilbert's trial counsel had asked her to take a picture of Gilbert to the hospital to see if Gueory could identify him as one of the assailants. Maynard accompanied her from the lawyer's office.

Mrs. Kemper stated that Maynard and Gueory did not converse at all, and that as she spoke with Gueory, Maynard walked away to visit another patient.

Her version of the substance of her discussion with Gueory also differed from Gueory's. Mrs. Kemper denied that she offered Gueory a bribe. She said Gueory recognized the picture of Gilbert but would not respond when asked if Gilbert shot him. She did get him to agree to sign a statement that Gilbert had not shot him. When asked on the stand what had resulted from this hospital visit, Mrs. Kemper responded: [9]

"I was charged with obstruction of justice. And I would never do anything to jeopardize myself, my family, or my job."

The Government attempted to impeach Mrs. Kemper with her grand jury testimony to the effect that, contrary to her testimony at trial, Gueory had specifically denied that Gilbert had shot him.

### III.

Appellant Maynard's principle contention on appeal arises out of the trial judge's ruling to admit evidence that Mrs. Kemper had been arrested and charged, but not convicted, for obstruction of justice. The Government specifically requested such a ruling, and indicated that it would ask Mrs. Kemper a direct question to this effect during her cross-examination.[10]

The theory under which the Government sought the admission of such evidence was that it indicated her bias, or motive for testifying in an exculpatory manner. Counsel for Maynard strenuously objected on the ground that the prejudice resulting from the admission of the charge would far outweigh its probative thrust.[11] The trial court ruled

---

7. Transcript at pp. 137–139.

8. Maynard's only other defense witness was Detective Caldwell who testified about Maynard's arrest. Transcript at pp. 272–274.

9. Transcript at p. 294.

10. Transcript at p. 278.

11. Transcript at pp. 279–280.

that the evidence would be admitted on the Government's theory,[12] at which point Maynard's defense counsel made the tactical decision to raise the issue of the arrest during his direct examination of Mrs. Kemper. He therefore elicited the testimony quoted *supra*. Maynard now contends that the admission of this statement was reversible error.

■ As a general rule it is improper to impeach a witness by showing an outstanding indictment without a final conviction.[13] The reasons behind this rule are that the mere fact of arrest or indictment is still consistent with innocence; an indictment involves repetition of someone else's assertion of the witness' guilt; and it raises a confusing, collateral issue to the case at trial.

■ In certain situations, however, external facts from which may be inferred a specific bias, or motive to testify in a particular way, are admissible to impeach a witness—e. g., facts which show a familial, employment, or litigious relationship.[14] Since the range of facts from which bias may be inferred is vast,[15] hard and fast rules permitting or excluding specific types of impeachment evidence might be unwise. Thus it may be argued in some cases that the pendency of an indictment against a witness produces a discernible motivation to falsify testimony such as: ill feeling for the person who procured the indictment; interest in currying a favorable disposition from the prosecution;[16] or, as in this case, the self-serving need to exculpate oneself concerning the events charged as a crime.

The Government argues that the trial court's decision to admit the arrest evidence to impeach Mrs. Kemper was not error, since the scope of cross-examination to elicit bias must be broad and is within the discretion of the trial judge. Further, the use of an indictment to show this particular type of bias has been approved in other Circuits.[17]

■ As there appears to be no direct precedent in this Circuit,[18] however, we are persuaded by appellant's argument that the prejudicial effect of the admission of the arrest and charge in this case outweighed its probative substance. Admission of these facts was simply not

---

12. Transcript at p. 280.

13. Michelson v. United States, 335 U.S. 469, 482, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Sanford v. United States, 69 U.S.App.D.C. 44, 98 F.2d 325 (1938); 3A Wigmore, Evidence § 980a (Chadbourn rev. 1970). *See also* Fenwick v. United States, 102 U.S.App.D.C. 212, 252 F.2d 124 (1958); Beasley v. United States, 94 U.S.App.D.C. 406, 218 F.2d 366 (1954), cert. denied, 349 U.S. 907, 75 S.Ct. 584, 99 L.Ed. 1243 (1955); Campbell v. United States, 85 U.S.App. D.C. 133, 176 F.2d 45 (1949). *Cf.* Lee v. United States, 125 U.S.App.D.C. 126, 368 F.2d 834 (1966).

14. *See* 3A Wigmore, Evidence § 949 (Chadbourn rev. 1970). *Accord*, United States v. Kinnard, 150 U.S.App.D.C. 386, 465 F.2d 566 (1972).

15. *See, e. g.*, the examples cited in United States v. Lester, 248 F.2d 329, 334–335 (2d Cir. 1957).

16. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931).

17. *See* Terminal Transport Co. v. Foster, 164 F.2d 248 (5th Cir. 1947), a civil case for wrongful death which involved the impeachment of the alleged wrong-doer with the fact that he had been indicted for killing the victim. The court gave no reasons for approving this type of impeachment, but cited two Alabama Supreme Court cases. *Terminal Transport* was cited for illustrative purposes only in United States v. Lester, *supra* note 15, 248 F.2d at 334.

18. Although Maynard relies heavily on McGill v. United States, 106 U.S.App. D.C. 136, 270 F.2d 329 (1959) that case involves a witness for the prosecution with charges pending against him which might influence him to curry the favor of the government in his testimony. In *McGill*, the trial court would only permit cross-examination about promises of leniency. This court upheld that ruling, stating "[b]ias cannot be shown simply by testimony of an arrest . . . where no conviction has resulted and where no showing is made of promises of leniency or the like." 106 U.S.App.D.C. at 137, 270 F.2d at 330. The type of bias referred to differs considerably from the type of bias the Government was trying to show in Mrs. Kemper, a defense witness.

necessary to show that Mrs. Kemper had good reason to testify as she did.[19] Gueory's own testimony had already revealed to the jury all the facts on the basis of which Mrs. Kemper could be charged with a crime. Her motive for denying Gueory's accusations and for testifying about her own actions in an exculpatory manner was unmistakeable. Finally, her being charged with a crime was probative of no more than that the prosecutor, or the grand jury, chose to believe Gueory and not Mrs. Kemper.

In this context, the extra impeachment provided by proof of the arrest and indictment is marginal. One can say that showing that this witness was under indictment evidenced a more forceful motive to exculpate herself than the general need to avoid incrimination. One can speculate that such a witness would be particularly spiteful against the person (Gueory) who got her into such difficulty, and give testimony accordingly. But the additional proof of interest is marginal, and it must be weighed against the very substantial prejudice to defendant Maynard from the admission of this evidence.

Knowledge of an arrest and indictment weighs heavily in the minds of laymen and casts the shadow of doubt on the witness' veracity. This was particularly unjustified in Maynard's case since Mrs. Kemper's arrest did not give her a specific motive to falsify her testimony about Maynard's conversation with Gueory. What Maynard said and did was unrelated to her alleged bribery attempt. Therefore, admission of her arrest served the purpose against Maynard for which such evidence is excluded in this Circuit—that of general impeachment of the witness' truthfulness. For

these reasons, admission of this evidence over the objection of Maynard's counsel was error.

We disagree with the trial court's characterization of any prejudice which might have resulted as "minimal."[20] After a careful scrutiny of the entire record, we are not assured that "the judgment was not substantially swayed by the error."[21] Mrs. Kemper was Maynard's principal defense witness. It was her word against Gueory's. It seems highly probable that the jury would be swayed by the knowledge that she was charged with obstruction of justice into discrediting her crucial testimony about the hospital confrontation. Therefore, Maynard's substantial rights to a fair trial were prejudiced and his conviction must be reversed.

■ We close by taking note of a problem of procedure. We are holding that Maynard is entitled to a reversal on the ground of the error of the trial judge in ruling that his witness, Mrs. Kemper, was subject to impeachment by a showing of her arrest and indictment, even though that fact was elicited by Maynard himself. Maynard's counsel did what he could to dilute, but he could not remove the prejudicial impact of the ruling. His offer of the evidence was in submission to the ruling of the District Court. Defense Counsel objected to the prosecution's proposal, fully argued the matter to the trial judge, was bound by the ruling. As counsel he was under a restraint against rearguing a point that had been fully argued. We think he was fairly entitled to treat the ruling as definite and complete, and to do what he fairly could to limit the prejudicial impact of the ruling.

19. *Cf.* United States v. Colonial Motor Inn, Inc., 440 F.2d 1227 (1st Cir. 1971).

20. At appellants' hearing on their motions for a new trial, the trial court expressed some uncertainty about this ruling; but concluded that even if the court were wrong, the prejudice was minimal. The court's basis for this conclusion appears to be that Gueory himself was discredited by extensive cross-examination into his drug addiction. *See* Transcript for October 14, 1970, at pp. 99–100.

21. Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). *See also* Campbell v. United States, *supra* note 13, 85 U.S.App.D.C. at 135–136, 176 F.2d at 47–48.

## IV.

██ Appellants Gilbert and Maynard contend that the rough notes taken by Detective Caldwell during his initial interrogation of Gueory in the hospital should have been made available to the defense under Brady v. Maryland and the Jencks Act. Trial counsel for both appellants repeatedly requested production.[22] At the pre-trial hearing to suppress Gueory's identification of Maynard, Detective Caldwell testified that Gueory first responded to his questions about the shooting on October 20, 1969. At that time Gueory also indicated that he did not want to prosecute.[23] Caldwell testified that during this interview Gueory identified one assailant by the name "Big" Gilbert, and described the others as follows: "Another was a Negro male of about six foot with a bush haircut and had glasses on. The other two subjects, he said, were short. He had never seen them in his life. He didn't know any of them."[24]

Caldwell further testified that he had taken rough notes consisting of at least four or five pages,[25] that he would have written down any descriptions given to him,[26] and that he had turned over these notes to the Assistant United States Attorney in charge of the case a few months before trial.[27]

At the conclusion of the direct examination of Gueory, which included his identification of both appellants, counsel for Maynard and Gilbert moved to strike Gueory's testimony on the ground that the rough notes had not been produced.[28] A search of the Government's file had revealed no notes, and the Assistant United States Attorney prosecuting the case stated that they must have been "thrown away."[29]

The trial court did not rule that the notes would not be subject to production, but stated that he would not hold up the cross-examination of Gueory at that time. If the documents were located, Gueory would be re-called for additional cross-examination. The trial court's only statement at trial concerning the Government's duty, and failure, to preserve and produce such notes was that the Government should make every effort to locate them and that there "would be no conspiracy to withhold it."[30]

Further inquiry into the disappearance of the notes took place during a hearing on appellants' motions for a new trial on October 14, 1970. The court at that time ruled that Detective Caldwell's notes were not producible under the Jencks Act because the contents of the notes had not been clarified, and because there was no indication that Gueory had adopted or approved Caldwell's transcription of his statements pursuant to section (e)(1) of the Jencks Act.[31]

These reasons, and the Government's assertion in its brief that it is "highly speculative" that these rough notes contained substantially verbatim statements producible under section (e)(2) of the

---

22. Transcript at 7, 135, 143–145. With regard to the P.D. Form 251 referred to cursorily in appellant Maynard's brief, the very existence of this so-called "missing" document was not proven.

23. Transcript at p. 12. Caldwell initially stated that Gueory could not offer any descriptions of his assailants, Transcript at p. 6, but later indicated that in fact descriptions had been given.

24. Transcript at p. 13.

25. Transcript at pp. 9, 51.

26. Transcript at p. 14.

27. Transcript at p. 7. Caldwell also testified that he thought photostatic copies were made and turned over to defense attorneys. Transcript at p. 10.

28. Transcript at p. 145.

29. Transcript at p. 144.

30. Transcript at p. 145.

31. Section (e)(1) of the Jencks Act defines a "statement" which must be produced by the Government as follows:
 "a written statement made by said witness and signed or otherwise adopted or approved by him."

Act,[32] do not meet the thrust of appellants' arguments and this court's ruling in United States v. Bryant.

First, defense counsel did attempt to clarify the contents of the notes as discussed above. It appears that the notes might well have contained Gueory's statements of a descriptive nature, or statements about "Big" Gilbert which might have been favorable to the defense. This court has previously discussed the importance of such notes and the information they might contain.[33]

Second, while it is clear that the duty of the Government to produce notes under the Jencks Act and under *Brady* cannot be definitely resolved because the notes cannot be scrutinized, the trial court's inquiry should not founder on impossibility. In *Bryant*, this court held that the Government's "duty of disclosure is operative as a duty of preservation"[34] which extends to all "discoverable" evidence, defined as including all evidence which "might" have to be produced under *Brady* or the Act.[35] *Bryant* further held that "sanctions for non-disclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures" for preserving evidence.[36]

Since there were no such regular procedures in force at times relevant to these cases, as in *Bryant* the trial court must employ a case-by-case determination of the degree of bad faith, negligence or inadvertence which led to the nondisclosure of arguably discoverable evidence. It is particularly important to note that the police officer preserved the notes and transmitted them to the United States Attorney's Office. Thus the usual administrative reasons which might have once justified, or at least excused, the police department's failure to preserve such notes are not applicable. The trial court below failed to focus on whether a different or higher duty to preserve evidence ought to apply to the prosecutorial branch of the Government. If the notes were "thrown away" and not just lost, this showing of bad faith, negligence or inadvertence cannot be ignored.

Further, there was no consideration of the appropriate sanction which might have been applied in light of a violation of the duty of preservation. The Jencks Act calls for exclusion of the testimony of the witness whose statements were recorded. What portion of Gueory's testimony would be affected must be determined. It has also been suggested that in a case where notes have been discarded, the "absence of notes may be . . . best handled by instructing the jury with an adaptation of the kind of instruction used in case of a missing witness, that the jury is free to infer that the missing original notes would have been different from the testimony at trial and would have been helpful to defendant."[37]

The trial judge is in the best position to determine what the circumstances of

---

32. Section (e)(2) defines a statement as follows:

"a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

33. United States v. Bundy, 153 U.S.App. D.C. 191, 472 F.2d 1266 (1972); *see also* United States v. Hines, 147 U.S.App.D.C. 249, 455 F.2d 1317, 1336 (dissenting opinion of Chief Judge Bazelon).

34. 142 U.S.App.D.C. at 141, 439 F.2d at 651.

35. 142 U.S.App.D.C. at 142, n. 21, 439 F.2d at 652 n. 21.

36. 142 U.S.App.D.C. at 142, 439 F.2d at 652. It was noted in *Bundy, supra* note 33, that the Metropolitan Police promulgated preservation procedures. 153 U.S.App.D.C. at 192, 472 F.2d 1267, n. 3.

37. United States v. Bundy, *supra* note 33, 153 U.S.App.D.C. at 193, 472 F.2d at 1268 (concurring opinion of Judge Leventhal).

this case require, after consideration of the actions of the United States Attorney and the importance for the impeachment of Gueory which the notes might have served. Accordingly, it is necessary that appellant Gilbert's case be remanded for an inquiry into these points;[38] to determine whether a sanction for nonproduction should have been imposed; and to determine whether Gilbert must receive a new trial.

If appellant Maynard is re-tried, the trial court must undertake a similar inquiry if Gueory testifies and if Detective Caldwell's notes are not produced.

## V.

Appellant Gilbert urges that his trial should have been severed from Maynard's because of their antagonistic defenses. Gilbert's motions for severance prior to trial, on the first day of trial, at the conclusion of the Government's case, and his motion for a new trial were all denied.[39]

Under Rule 14 of the Federal Rules of Criminal Procedure the court may grant severance if a defendant is "prejudiced" by joinder. This determination rests largely within the discretion of the trial court and the standards for review in this court were set forth recently:

> In order to demonstrate abuse of discretion by a trial judge, one must show more than the fact that co-defendants whose strategies were generally antagonistic were tried together.

. . . At the very least, it must be demonstrated that a conflict is so prejudicial that differences are irreconcilable, and "that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty."[40]

According to Gilbert's argument, the source of the conflict is that Maynard's defense required use of Mrs. Kemper as a witness to rebut Gueory's testimony incriminating Maynard. Once she was on the stand, admission of her arrest for obstructing justice lent credibility to Gueory's version of the entire hospital visit and caused the jury to infer Gilbert's guilt from Gueory's version of the desperate bribery attempt. Since Gilbert would not have called upon Mrs. Kemper in a separate trial, the prejudicial impact of the arrest evidence was a result of the joinder and should have been avoided through severance.

■ However, our decision that the admission of the indictment was erroneous in the first place would appear to shift the focus of this claim. The real issue is whether admission of the arrest to impeach Mrs. Kemper was as substantially prejudicial to Gilbert as it was to Maynard.

The evidence implicating Gilbert in the attack on Gueory was stronger than was the case against Maynard.[41] Balanced against this, Gilbert presented an alibi defense in his own behalf which was corroborated by three companions.[42] Whether admission of Mrs. Kemper's ar-

38. The factors to be considered upon remand were stated in *Bryant* as follows: "the District Court should weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice." 142 U.S.App. D.C. at 143, 439 F.2d at 653.

39. Transcript at pp. 103, 226, and Transcript of October 14, 1970, at p. 97.

40. United States v. Robinson, 139 U.S.App. D.C. 286, 289, 432 F.2d 1348, 1351

(1970), citing Robinson v. United States, 93 U.S.App.D.C. 347, 210 F.2d 29 (1954) and Rhone v. United States, 125 U.S.App. D.C. 47, 48, 365 F.2d 980, 981 (1966).

41. Gueory claimed to have identified Gilbert by sight at the time of the crime, and Gilbert was also identified by Doris Green. In addition, there was evidence from Gueory that just prior to trial Gilbert had approached him suspiciously. Transcript at pp. 302–304.

42. Transcript at pp. 192–208.

rest swayed the jury in these circumstances is a difficult question on which we do not have the full benefit of argument or of the trial court's consideration. Therefore, in the context of the remand of Gilbert's case it would be appropriate for the trial court to direct an inquiry into this issue and to determine whether on this ground Gilbert must be awarded a new trial.

We have considered the other issues raised by Maynard and Gilbert and find them to be without merit. Should Maynard be re-tried, the Legal Aid investigator's report will be available to him.

Accordingly, the judgment in No. 24,938, United States v. Maynard, is reversed and No. 24,939, United States v. Gilbert, is remanded pursuant to this opinion.