Timothy WASHINGTON, Appellant,

v.

UNITED STATES, Appellee.

No. 83–688.

District of Columbia Court of Appeals.

Argued May 14, 1985.

Decided Sept. 30, 1985.

Mark Rochon, Public Defender Service, with whom James Klein and Mark S. Carlin, Public Defender Service, Washington, D.C., were on the brief, for appellant.

Lynn Lincoln Sarko, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Thomas J. Tourish, Jr., and Charles Leeper, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before PRYOR, Chief Judge, and NEBEKER and TERRY, Associate Judges.

PRYOR, Chief Judge:

Following a three-day jury trial, appellant Timothy Washington was convicted of armed robbery (D.C.Code §§ 22–2901, –3202 (1981)); assault with intent to kill while armed (*id.* §§ 22–501, –3202); and carrying a dangerous weapon (*id.* § 22–3204). On appeal, Washington contends that the trial court erred in (1) limiting appellant's counsel's time to review certain Jencks material;[1] (2) limiting appellant's cross-examination of the complaining witness; and (3) refusing to allow appellant to call the complainant's former boyfriend as a witness for impeachment purposes. We affirm.

### I

At trial, the government's evidence showed that on the evening of September 25, 1982, the complainant drove to the Potomac Gardens apartment complex in the District of Columbia to look for her former boyfriend, Richard Alexander, and to buy some marijuana.

After she was unable to locate Mr. Alexander, the complainant encountered Washington in the apartment complex parking lot. The complainant had never met Washington prior to that evening. Appellant showed the complainant where marijuana could be purchased, and paid for the marijuana himself because the complainant had left her money in her car.

The complainant and appellant spent approximately one hour and a half together in the Potomac Gardens vicinity, talking and getting acquainted. They discussed the possibility of starting a relationship. After smoking some marijuana, they returned the rest to the dealer because it was of poor quality.

The complainant testified that at about 2:00 a.m., she began to get bored, and became aware that it was very late and thus, told appellant that she was leaving to go home. Appellant gave the complainant his name and phone number, and she wrote the information on a notebook pad she kept in her purse.

Appellant then asked the complainant if she would drop him off at Barry Farms, which was on her way home. The complainant testified that she agreed to drive appellant to Barry Farms because he seemed to be a "nice man," and did not appear to have a car or any other way to get home.

When they arrived at Barry Farms, appellant told the complainant to wait, left his jacket in the car, and went briefly inside one of the apartment buildings. When he returned to the car, he told the complainant to take him back to Potomac Gardens. The complainant testified that she was confused and annoyed because she thought appellant lived at Barry Farms. She testified further that she argued with appellant throughout the return trip to Potomac Gardens, and that he became "very cold and distant" and uncommunicative.

It was nearly 3:00 a.m. when they arrived back at Potomac Gardens. The complainant stopped the car in the parking lot in order to let Washington out. At that point, Washington reached over and turned the car's ignition key, shutting off the engine. According to the victim's testimony, appellant suddenly punched her in the face and told her "not to look at him." After punching her several more times, he ordered her to move over so he could drive.

1. *See* 18 U.S.C. § 3500(c) (1982); Super.Ct. Crim.R. 26.2.

The victim grabbed her purse, jumped out of the car, and began to run away and scream for help. Moments later, appellant caught up with her and began to stab her with a knife. Appellant stabbed the victim repeatedly in her breast, abdomen, and vagina. When the victim finally fell down, appellant stabbed her again at the base of her spine and in her thigh. He then picked up her purse, which contained $50 and the notebook with appellant's name and phone number and ran away.

When the police arrived on the scene, the victim gave Metropolitan Police Department Officer Halgren a description of her assailant—"dark skin, scar on his eye, about 5'9" " and told them his name was Timothy Washington. The victim was taken to D.C. General Hospital and while she was in the emergency room she told another police officer that her attacker's name was Timothy Washington. Two days after her attack, a police officer went to D.C. General Hospital and showed the victim photographs of potential suspects. The victim identified appellant's photograph as that of her assailant. After her release from the hospital, the victim also identified appellant in a police lineup.

Three residents of the Potomac Gardens apartment complex testified for the government at trial.

Jewel Cade and her brother, Nathaniel Cade, who lived in a third-story apartment overlooking the scene of the stabbing, testified that at approximately 3:00 a.m., they heard someone screaming. Jewel Cade opened the window and both of them observed a man stabbing a girl with a knife. Both witnesses testified that the area where the stabbing occurred was well-lit. Nathaniel Cade testified that he was able to briefly observe the left side of the attacker's face. Similarly, Jewel Cade testified that she got a "good look" at the man's face. The Cades called the police and then rushed to assist the victim. When the police arrived, Nathaniel Cade

gave them a description of the assailant which matched the victim's description.[2]

On the evening following the stabbing, appellant was seen near the apartment complex by another Potomac Gardens resident, Angela Reddick. Reddick testified that earlier that day she had heard appellant bragging about stabbing a woman and nearly killing her. Upon seeing appellant again, Reddick told her mother and their neighbor, Jewel Cade. Ms. Cade immediately telephoned the police.

When the police arrived, Jewel Cade identified appellant as the man she had seen the previous evening stabbing the complainant. The police officers. approached appellant and attempted to question him but he refused to give the officers his name and attempted to flee. The police apprehended appellant and recovered a knife from his jacket pocket.

Appellant relied on an alibi defense at trial. Appellant's mother testified that appellant was with his girlfriend on September 25, 1982, and returned home at 2:00 a.m. Appellant's friend, James Cox, testified that he and appellant were together, smoking marijuana, immediately before appellant was arrested. Cox implied that appellant ran from the police when he was confronted because he was in possession of marijuana at the time. Appellant did not testify at trial.

During trial, and immediately prior to the complainant's direct testimony, the prosecutor turned over Jencks material concerning the complainant to defense counsel. The Jencks material consisted of ten pages of the complainant's grand jury testimony and a two-page handwritten statement by the complainant. At the conclusion of the complainant's direct examination, defense counsel requested a recess in which to review the material. Over defense counsel's objection that the recess was inadequate, the trial court granted a five-minute break. The trial resumed after

---

2. Nathaniel Cade subsequently identified appellant from a photograph of the lineup. Both Nathaniel and Jewel Cade identified appellant in court at trial.

five minutes with defense counsel's cross-examination of the complainant.

## II

### A.

■ Appellant's first contention is that his rights under the Jencks Act were violated. Specifically, appellant complains that the trial court abused its discretion in granting only a five-minute continuance for the purpose of letting defense counsel review the complainant's Jencks material. We disagree.

Superior Ct.Crim.R. 26.2, which implements the Jencks Act, 18 U.S.C. § 3500(c) (1982), in the District of Columbia, provides in subsection (d):

Recess for examination of statement.

Upon delivery of the statement to the moving party, the Court, upon application of that party, *may* recess proceedings....

Thus, under this rule, the decision of whether and to what extent a continuance should be granted, for the purpose of reviewing Jencks Act material, rests in the discretion of the trial court. *See United States v. Augenblick,* 393 U.S. 348, 355, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969) (entrusting overall administration of Jencks Act to the trial court's good sense and experience); *Jones v. United States,* 343 A.2d 346, 350 (D.C.1975); *United States v. Perry,* 153 U.S.App.D.C. 89, 95, 471 F.2d 1057, 1063 (1972).

Upon reviewing the proceedings in this case, we do not find that the trial court abused its discretion in granting only a five-minute continuance following the complainant's direct testimony.

Before ruling on defense counsel's request for a continuance, the trial judge first read the Jencks material himself to determine its volume and complexity. After considering the nature and content of the material, the trial judge concluded that the twelve pages "substantially track[ed]" the witness' direct testimony and could be

adequately examined in a five-minute recess.

Appellant contends rightfully that the Jencks Act contemplates not only the furnishing of a witness' statement, but also a reasonable opportunity for defense counsel to examine and utilize that witness' Jencks material. Under the circumstances of this case, however, we believe appellant was given such a "reasonable opportunity."

Nor do we find *United States v. Hinton,* 203 U.S.App.D.C. 187, 631 F.2d 769 (1980), the principal case upon which appellant relies in support of his argument, persuasive authority to the contrary. In *Hinton,* the United States Court of Appeals for the District of Columbia Circuit held that a defendant was prejudiced when his counsel failed to request a recess during a suppression hearing in order to study voluminous Jencks materials relating to three different witnesses. *See id.* at 188 n.2, 631 F.2d at 770 n.2. Not only was the material provided massive in quantity but it also revealed many inconsistencies between certain witnesses' identification testimony at trial and earlier identifications given by those witnesses. *Id.* at 190–95, 631 F.2d at 772–77.

This case is clearly distinguishable from *Hinton.* Here, defense counsel received a limited amount of Jencks material. In addition, no significant inconsistencies existed between the complainant's trial testimony, grand jury testimony and written statement. Finally, defense counsel requested and *was* granted a limited amount of time in which to review the material, and did so.

In light of the nature, quantity, and content of the Jencks material provided in this case, we conclude that the trial court did not err in granting only a five-minute recess to review complainant's Jencks material. *Compare United States v. Holmes,* 722 F.2d 37, 40 (4th Cir.1983) (court abused discretion where it gave counsel only five-minute recess to review Jencks material consisting of a "stack of paper at least eight inches thick, including a thousand pages of testimony obtained from ten wit-

nesses, a forty-five minute tape recording and other documents").

## B.

Appellant also argues that his Sixth Amendment right to confront the witnesses against him was infringed when the trial court limited defense counsel's cross-examination of the complaining witness. According to appellant the trial court unfairly restricted defense counsel's questions concerning (1) whether the complainant was seeking to purchase PCP on the night she was stabbed, and (2) whether the complainant had a motive to fabricate her testimony. Upon our review of the record, we find that the trial court gave defense counsel considerable leeway in cross-examining the complainant sufficient to satisfy the requirements of the Sixth Amendment.

■ The right to cross-examine witnesses is an integral part of the Sixth Amendment right of confrontation. *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974); *Lawrence v. United States,* 482 A.2d 374 (D.C.1984). While "reasonable latitude" must be given to the cross-examiner in order to afford the defendant a fair trial, *Alford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931), it is always within the discretion of the trial judge to curtail "cumulative, repetitive, or irrelevant testimony," and to "control the scope of examination of witnesses." *Geders v. United States,* 425 U.S. 80, 86–87, 96 S.Ct. 1330, 1334–35, 47 L.Ed.2d 592 (1976); *see also Springer v. United States,* 388 A.2d 846 (D.C.1978). Thus, "an evidentiary ruling by a trial judge on the relevancy of a particular item ... will be upset on appeal only upon a showing of 'grave abuse.' " *Mitchell v. United States,* 408 A.2d 1213, 1215 (D.C.1979) (quoting *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978) ).

During his cross-examination of the complainant, defense counsel posed numerous questions about the complainant's reasons for going to Potomac Gardens on the evening she was stabbed. Defense counsel attempted to elicit answers which would show that the complainant went to Potomac Gardens for the purpose of buying PCP, and not to see a former boyfriend and buy marijuana as she had testified on direct examination. The complainant repeatedly denied any knowledge of PCP and reaffirmed her stated purpose in visiting Potomac Gardens. Following these denials defense counsel continued to question the complainant about purchasing "drugs" or PCP. Viewing this matter as collateral in nature, and any further inquiries as repetitive, the trial court asked defense counsel to cease this line of questioning. Appellant now contends that this was error.

■ We agree with the trial court's conclusion that whether the complainant went to Potomac Gardens on the night of the assault to purchase PCP as opposed to marijuana was collateral to the central issue in the case—whether appellant stabbed and robbed the complainant. In light of the complainant's numerous denials that she went to purchase PCP, and the ancillary nature of the inquiries themselves, any further questioning on this issue was cumulative and unnecessary. Where "cross-examination of a witness has been extensive, repetitive, and protracted ... and further questions along this line would be merely cumulative, the trial judge [may] properly limit the scope of cross-examination without in any way harming defendant's case." *United States v. Pugh,* 141 U.S.App.D.C. 68, 70, 436 F.2d 222, 224 (1970). Thus, we think the trial judge exercised proper discretion in cutting short appellant's further cross-examination of the victim on this issue.

Appellant also complains that the trial court erroneously refused to allow defense counsel to question the complainant about a possible motive she might have to deny any knowledge about PCP. Specifically, the court sustained the prosecutor's objection to defense counsel's inquiries about whether certain of the victim's family mem-

bers knew why she had gone to Potomac Gardens. In sustaining the objection, the trial court noted that the victim was "a twenty-four year old female ... entitled to go anywhere she wants anytime she wants ... [and] is not responsible to her parents ...", and further that her reasons for going to Potomac Gardens were collateral to the issue of whether she had correctly identified appellant as her assailant.

■ As previously stated, the trial court has broad discretion to limit time-consuming and highly speculative inquiries during cross-examination. Moreover, even if we were to agree with appellant that this proposed line of questioning was both relevant and proper, we are not persuaded that the trial court's ruling constituted an abuse of discretion. It is well-established that the right to explore a witness' possible bias or motive is not without limits. *See Sherer v. United States*, 470 A.2d 732, 737 (D.C. 1983), *cert. denied,* — U.S. ——, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984); *Brown v. United States*, 409 A.2d 1093, 1099 (D.C.1979). Defense counsel's questions concerning what complainant's uncle and other family members might think about the use of PCP, could reasonably have been viewed by the trial court as being too remote. We believe, that under these circumstances, the trial court properly exercised its discretion in limiting defense counsel's line of questioning.

### C.

Finally, appellant contends that the trial court committed reversible error in refusing to permit the defense to call the complainant's former boyfriend, Richard Alexander, as a witness. According to the defense proffer at trial, Alexander would have testified that (1) prior to trial the complainant told him that she went to Potomac Gardens in order to buy "lovely"—a term for PCP, and (2) following her testimony in court, the complainant approached him in the witness waiting room (immedi-

ately outside the courtroom) and told him "don't say anything about the lovely."

As previously stated, the trial court correctly found that the complainant's purpose in going to Potomac Gardens on the night in question was a collateral issue. Thus, Alexander's testimony on this question constituted extrinsic evidence offered to impeach the complaining witness on a collateral matter.

■ It is well settled that a party may not present extrinsic evidence to impeach a witness on collateral issues. *See, e.g., McClain v. United States*, 460 A.2d 562, 569 (D.C.1983); *Ibn-Tamas v. United States*, 407 A.2d 626, 643 (D.C.1979); *Ewing v. United States*, 77 U.S.App.D.C. 14, 21, 135 F.2d 633, 640 (1942), *cert. denied,* 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145 (1943). The trial court, therefore, correctly ruled that Alexander's testimony in this regard was precluded as relating to a collateral issue—"that is, it would not have been admissible independently for any purposes other than the contradiction." *McClain v. United States, supra,* 460 A.2d at 569; *see Moss v. United States*, 368 A.2d 1131, 1135 (D.C.1977).

Mr. Alexander's proposed testimony about the complainant's alleged effort to influence his testimony, *i.e.,* to "corrupt the proceedings," presents a more difficult question.

■ We agree that, as a general rule, a defendant is entitled to wide latitude in presenting evidence tending to impeach the credibility of a witness, especially where that evidence relates to a key government witness. *See Lawrence v. United States*, 482 A.2d 374, 377 (D.C.1984). Moreover, insofar as the complainant's alleged conduct manifested a willingness to corrupt the trial, the excluded testimony constituted evidence tending to show bias. McCormick on Evidence § 40, at 87 (3d ed. 1984); 3A J. Wigmore, Evidence § 943 (Chadborn Rev.1970).[3] While under the

---

3. One form of bias is "a willingness to obstruct the discovery of the truth by manufacturing or

general rule, evidence impeaching the credibility of a witness may only be shown on cross-examination, and may not be proved through extrinsic evidence, *see* FED.R.EVID. 608(b), it is the accepted view that evidence of bias *may* be shown through extrinsic evidence. *See* 3A J. WIGMORE, *supra*, § 943, at .777; *United States v. Maynard*, 155 U.S.App.D.C. 223, 227, 476 F.2d 1170, 1174 (1973).

The majority of courts, including this court, agree, however, that before extrinsic evidence may be introduced to demonstrate acts or declarations showing corruption or bias, a proper foundation must be laid. *See Simmons v. United States*, 364 A.2d 813, 816 (D.C.1976); McCORMICK, *supra*, § 40, at 87–88. The reasons underlying this requirement include fairness to the witness, and conservation of time by making extrinsic evidence unnecessary. *See* McCORMICK, *supra*, § 40, at 88. Thus, counsel must first ask the witness under attack about the alleged facts on cross-examination before counsel may seek to prove prior expressions of bias or corruption by introducing other witnesses or evidence.

■ In the instant case, counsel never laid such a foundation, by asking the complainant whether she knew of the alleged conversation. Accordingly, the trial court did not commit error in excluding extrinsic evidence, *i.e.*, Alexander's proposed testimony on this question.

■ Even if we were to conclude, however, that the trial court abused its discretion in not allowing Mr. Alexander to testify for the very limited purpose of telling the jury that the complainant allegedly tried to influence his testimony, we would not find reversible error. In light of the compelling evidence of appellant's guilt, and other testimony adduced at trial affecting the complainant's character, we believe the omission of Mr. Alexander's testimony could not have "substantially swayed" the final judgment and, thus, this omission was

suppressing testimony." 3A J. WIGMORE, *su-*

harmless error. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *United States v. Lewis*, 157 U.S.App.D.C. 43, 57–58, 482 F.2d 632, 646–47 (1973); *see also United States v. Pugh, supra*, 141 U.S.App.D.C. at 72, 436 F.2d at 226.

In sum, none of appellant's contentions on appeal support a finding of reversible error. Accordingly, his convictions are

*Affirmed.*