**UNITED STATES of America**

v.

**Daniel J. BOWLES, Appellant.**

**No. 72–1427.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 6, 1973.

Decided Nov. 9, 1973.

As Amended Dec. 11, 1973.

Certiorari Denied March 25, 1974.
See 94 S.Ct. 1591.

**1308**

David Epstein, Washington, D. C. (appointed by this court), for appellant.

Richard S. Vermeire, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Stephen W. Grafman, Asst. U. S. Attys., were on the brief, for appellee.

Before McGOWAN and MacKINNON, Circuit Judges and WYZANSKI,* Sen-

ior United States District Judge for the District of Massachusetts.

MacKINNON, Circuit Judge:

This post-conviction proceeding seeking a new trial or, alternatively, the dismissal of the indictment, follows our *en banc* decision in Bowles v. United States, 142 U.S.App.D.C. 26, 439 F.2d 536 (1970) (*en banc*), cert. denied, 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971), affirming appellant's conviction of murder in the first degree (while attempting to perpetrate a robbery)[1] and of assault with intent to rob.[2]

The majority opinion in the *en banc* hearing sets forth the facts relevant to the conviction, which arose out of a fatal stabbing and attempted robbery of Donald Ingham, a soldier, on March 14, 1967 in an alley in the rear of the 1400 block of R Street Northwest, in Washington. The jury verdict followed a trial which ran from March 13 to 22, 1968, and the jury recommended a sentence of life imprisonment. On April 26, 1968 appellant was sentenced to concurrent prison terms of life imprisonment on the murder count and three to ten years for assault with intent to rob.

Then followed the appeal which resulted in the *en banc* decision, *supra*. That appeal was argued, *en banc*, on November 24, 1969, and the decision thereon was issued on November 20, 1970. In early October 1969, prior to the argument on November 24, 1969, counsel for appellant went to the office of the United States Attorney and informally discussed the issues with the Assistant United States Attorney assigned to the then pending appeal. During this discussion appellant's counsel was shown two typed, signed statements contained in the Government's file on the case.[3]

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. D.C.Code § 22–2401 (1967).

2. *Id.* § 22–501.

3. These statements were delivered to appellant's two counsel prior to (or on) October 8, 1969. They decided not to make any motion predicated on such statements because they considered "the possibilities for reversal

These statements, taken from two persons among the many who were interviewed in the broad investigation immediately undertaken in the area following the discovery of the murder, recited facts given to the Metropolitan Police on March 15, 1967, the day following the murder, by Rose Marie Bannister and Edith Mickins. The defense was not aware of the existence of these individuals or their statements at the time of trial. When appellant's counsel received these statements in early October, 1969, he took no action with respect to them, though he had ample time to inject any issue raised by them into the forthcoming appeal, since oral argument was not scheduled until November 24, 1969, substantially more than a month away. However, approximately two years later on October 14, 1971, appellant filed the instant motions alleging that the circumstances surrounding the statements amounted to a violation of the principles enunciated in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The instant motions for a new trial, or dismissal of the indictment followed and were grounded on the failure of the Government, notwithstanding requests prior to trial by defense counsel for such information, to provide defense counsel with alleged "exculpatory evidence"[4] which was in its possession, and its "obligation by virtue of the decision in Brady v. Maryland to disclose to defense counsel anything that comes to their attention which would be helpful to the defense."[5] Appellant contends that the events recited in the Bannister and Mickins statements constituted "exculpatory evidence."

Full hearings were held on the instant motions on January 31 and February 29, 1972, at which testimony was taken of Bannister, Mickins and one Samuel Floyd, the "Floyd" referred to in the Bannister statement. Thereafter on March 28, 1972 the trial court filed a Memorandum Opinion denying the motion for a new trial and the alternative motion for dismissal of the indictment. We affirm.

## I

Appellant's principal contention is that the failure of the Government prior to trial to inform him of the contents of the Bannister and Mickins statements, and the circumstances to which they refer, constitutes reversible error.

The principal fact that appellant relies on in the Bannister statement (given at 11:32 A.M. on March 15, 1967) is a reference to a conversation at 1 o'clock in the *afternoon* of March 14, 1967 (following the murder in the early morning hours of that day) with one "Floyd," an acquaintance of Bannister and Mickins, who was later identified as Floyd Harris:

> On Tuesday, March 14th, 1967 about 1:00 p. m., while at 14th and S Street, N.W. I met a man that I know as Floyd who lives at 1703 or 1705 13th Street, N.W. I called him over to where me and Edith Mickens were and asked him to go with us to the Charles Hotel. While at 14th and R street N.W. and on the way to the hotel I brought up the subject that wasn't it a shame about that boy being killed at 14th and R Street N. W. At this time Floyd told me that he had been at 14th and R Street N. W. and that he saw a white boy being chased by some boys and the damn fool ran up the alley. He then caught a cab and left because he knew that there was going to be trouble. That was about all that was said and we were about at the hotel at this time.
>
> Statement of Rose Marie Bannister, female, negro, 28 years of age.

Govt.Br. 13–14.

---

of the conviction on [other] grounds . . . were . . . strong." Affidavit of Isaac N. Groner of October 4, 1971; Affidavit of David Epstein of October 8, 1971.

4. Appellant's Br. 1.

5. *Id.* at 1–2, citing Cohen affidavit and transcript.

In the Mickins statement (given at 12 noon on March 15, 1967),[6] appellant seeks reliance upon the assertions that:

> On . . . March 14th, 1967 . . . about 1:00 a. m. by the clock at Peoples Drug Store [at Thomas Circle she] left and walked on 14th Street N.W. heading towards R Street. . . .
>
> While on 14th Street N.W. near the High's store (R.I. and N Street N.W.) I was walking behind a white male,

6. The full Mickins statement follows:

Office of the Homicide Squad
Metropolitan Police
   Department
Washington, D.C.
Wednesday,
   March 15th, 1967
Statement started at
   12 noon

Re: Death of Donald W. Ingham, male, white, 20 years of age, pronounced dead at 3:50 a.m. Tuesday, March 14th, 1967 at the D.C. General Hospital by Dr. David Law of staff.

Statement of[:]    Edith Edmonia Nickins, female, negro, 23 years of age DOB 12-5-43. 941 M Street N.W. 2nd floor middle room. Also Charles Hotel room #310, 1300 block of R Street N.W.

On Monday, March 13th and Tuesday, March 14th, 1967 from about 10:00 p.m. to 3:30 a.m., I was on the street from Peoples Drug Store Thomas Circle on 14th Street N.W. to about R Street N.W. It was about 1:00 a.m. by the clock at Peoples Drug Store that I left and walked on 14th Street N.W. heading towards R Street on the East side of the street. The same side that Peoples is on.

While on 14th Street N.W. near the High's store (R.I. and N Street N.W.) I was walking behind a white male, and I guess that I was walking loud or something and any way he jumped back. He looked back and said Hi to me, and I said Hi. His exact words were "Hi how are you" and I said all right. He asked me where I was going, and I said no where special, just walking. He did not say anything so I asked him if he was sporting tonight and he said no.

Nothing else was said and I walked up 14th Street N.W. to R Street and he was behind me all the way. I knew that he was behind me as I would look back once in a while. While on 14th Street at R Street a Green and white car was there, and a man motioned me over and he began to make a turn into R Street and I got in the car there. R Street was one way so then he backed out and we then went up 14th Street N.W. The man in the car was white, and I stayed with him for about ten or fifteen minutes. On the way back to Peoples to meet Ross I met another car at N Street and I went to the Woodner Hotel with this man. This was about 1:45 a.m. It was about 2:45 a.m. that I left the Woodner. Later I went to 14th and U Street N.W. for a sandwich and met Ed Shannon and then he and I caught a cab and went home to N Street N.W.

Questions by Det. Sgt. Joseph M. O'Brien.

Q. Today you went to the D.C. Morgue and viewed the body of a white male identified to you as Donald W. Ingham and I ask you if this is the same white male that you met on 14th Street N.W. something after 1:00 a.m. Tuesday, March 14th, 1967 near the High's store?

A. Yes that is the same one.

Q. Do you know of any one that takes the tricks to 14th R and Johnson Ave. N.W.?

A. There are two girls that works 14th and R, and they take the tricks down R that way, but I do not know where they go or who they are.

Q. Do you know a girl named Margo?

A. Yes. I saw her Monday night and Tuesday morning. Before I picked up the trick for the Woodner Hotel I saw her at 14th and U Street N.W. in the wings and she was wearing a blonde wig and slacks with checks. She was with her man then.

Q. Were you with Rose Bannister on Tuesday at 1:00 p.m. when Floyd was telling Rose about seeing the boys chasing a white man at 14th and R Street N.W.?

A. Yes.

Statement given and typed by Det. Sgt. Joseph M. O'Bren [sic].

/s/ Edmonia Nickins

Govt. Br. at 16–17.

and I guess that I was walking loud or something and any way he jumped back. He looked back and said Hi to me and I said Hi. His exact words were "Hi how are you" and I said all right. He asked me where I was going, and I said no where special, just walking. He did not say anything so I asked him if he was sporting tonight and he said no.

Nothing else was said and I walked up 14th Street N.W. to R Street and he was behind me all the way. I knew that he was behind me as I would look back once in a while.

Govt. Br. 16. The statement goes on to say that Mickins went to the D.C. morgue on March 15, 1967 and viewed the body of Donald W. Ingham (the victim of the murder) and identified it as being the body of the same white male that she "met on 14th Street N.W. something after 1:00 a. m. Tuesday, March 14th, 1967 near the High's store."[7]

Appellant also contends that had he been given the Bannister and Mickins statements he would have been led to "Floyd," later identified as "Floyd—Hugh Harris, Jr.," who would have given evidence that could have caused the jury to acquit appellant.

After they obtained the Bannister and Mickins statements on March 15, 1967, Detective J. C. Butler, No. 2 Precinct, and Joseph M. O'Brien of the Homicide Squad searched for and located "Floyd" and made the following contemporaneous written resume of their interview with him:

To 1703 and 5 13th Street N.W. and attempt to locate Floyd. Not known in the area. Checked with the girls and given a better description cruised 14th Street and outside of Browns at 14th and T Street N.W. a subject later identified as Floyd—Hugh Harris Jr., M–N–24 1415 17th Street N.W. # 2 was interviewed. This subject was wearing a black leather ¾ length jacket and a blue tam and there are two front upper teeth missing. Stated that he read the story in the News on the afternoon of 3-14-67 and that when Rose Marie brought up the subject and blamed it on some young boys he agreed with her, and related what he had read in the paper. Stated that he lives with Ellen Matthews at 17th Street Address. Also with another girl named Ella Richardson who lives on Montello Ave. N.E.

On 3-14-67 he was home at 6:15 p m. 8:00 p. m. to the Spa. 11:30 p. m. he went home. Four white males in the Spa with two white and two negro females. Shown photo of deceased.

This subject was not one of the four. The foregoing statement is an exhibit from Government opposition to motion for new trial in Criminal Case No. 699-67, the murder trial, pp. 3–4.

"Floyd's" testimony on January 31, 1972 in the instant proceeding substantially corroborated the officers' resume of their March 15, 1967 interview with him which indicated that he had seen *boys* (not Bowles who was 35 years of age) chasing a person of light or white

7. The story in the Washington Daily News (an afternoon paper) on March 14, 1967 under the headline "Ft. Meade Soldier Fatally Knifed in D.C. Alley" stated:

A 20 year-old Ft. Meade soldier was found stabbed to death in a Northwest alley today, his pockets picked clean and ripped, District Police said. The body was found by two detectives who drove into the alley behind the Gladstone Apartments, 1423 R St., N.W. while on a routine patrol at 2:15 a. m. Detectives said the soldier identified as Pfc. Donald Ingham, white of Linwood, N. J., had been dead about an hour. Police said that scattered around

the alley were his wallet, his car keys, several cigarettes, and some change. Ft. Meade officials said Pfc. Ingham had left the base where he is attached to a Signal Missile Company, after retreat yesterday afternoon. His car was found some 12 blocks away at 10th and I Streets, N.W. Police feel that Pfc. Ingham was lured to the alley on one pretext or another. They said about an hour later, another man apparently also was lured to the same block and robbed of $21.00. From the "Government Opposition" (at 3 n. 3) to motion for new trial in Cr.No. 699–67 (the murder trial).

complexion at about 11:30 P.M. on November 13, 1967 across the street from the Spa and that they were headed in the direction of the alley where Ingham was later found dead. In an interview on January 13, 1972 (Tr. 14) Floyd stated he thought he could recognize the person being chased and after being shown pictures of Ingham said "No . . . that was not the man" (Tr. 21–22). He also denied having made any statement about "seeing anybody being chased up an alley" (Tr. 32). Floyd also testified that it was "almost a daily occurrence" to see a white person being chased in that area and that he had seen about thirty similar occurrences—"not only whites. They chase blacks too." A more extended resume of his testimony given in this proceeding is set forth in the margin.[8]

When the Bannister, Mickins and Floyd testimony is considered together it establishes that Floyd never saw anybody being chased up an alley, and the chase he did see occurred at least an hour and a half prior to the time that Edith Mickins saw Ingham alive in the same general area where he was later found dead.

## II

It is well established that it is a violation of due process for the prosecution to suppress "evidence favorable to

---

8. In his testimony given in this proceeding on January 31, 1972, Samuel D. Floyd testified substantially as follows:

His true name is Samuel D. Floyd. He did not know the defendant Daniel Bowles but had seen him some years ago once or twice (Tr. 4). At "about 11:30 p. m." on March 13, 1967 he came out of the 'Spa,' a place in the 1900 block of 14th Street and "saw three young guys chasing one guy up the street. . . . They were right in front of the store across the street from the Spa. They were running across 14th Street. . . ." He was not able to identify any of the three boys except "that they were young." He doubted that Bowles was "one of them. I wouldn't say that he was. . . . I would say that he is not one of them." He was only able to identify the person who was being chased as "of a light complexion or white" (Tr. 6–7). He later crossed the street on T Street in the 1300 block and saw a "guy" holding up a paper bag with a soldier's hat in it which he had picked up off the ground. He "didn't notice anyone drop [the bag with the soldier's hat in] it." The man who was being chased had run from the direction of the bag and "possibly" could have dropped it. An overseas cap was in the bag (Tr. 8) and toilet articles. He saw five or six people standing by the bag inspecting it (Tr. 9) and "evidently" some of these people had been chasing the man up the street "but they wasn't still chasing." He saw them chasing the man until they turned right around the corner on S Street in the 1400 block. There is an alley that runs from Johnson Avenue to 15th Street (Tr. 10). He did not see the boys chase the man beyond 14th Street when they turned right on S Street (Tr. 12). After he saw the people inspecting the bag "he got in [a] car and went home" (Tr. 9) at 11:30 P.M. (Tr. 27, 40) and he was never on 14th and R Street after he left the Spa (Tr. 28).

When Floyd was interviewed by the Assistant United States Attorney on January 13, 1972 (Tr. 14) he stated he thought he could recognize the person who was being chased if he saw him again (Tr. 14, 16). He was at that time shown several pictures of Ingham (the victim) and he stated, ". . . No, that was not the man [he saw being chased]." He was at that time shown the pictures a second time and he looked at them very carefully and was asked whether he was "sure about that." His response was still, "No . . . that was not the man" (Tr. 21–22).

Floyd was also shown more than one photograph of Ingham from the waist up on March 15, 1967 (Tr. 23, 24) and at that time he had also stated that he did not recognize him (Tr. 25, 27). He knew Bannister and Mickins (Tr. 30), he had a conversation with them within a day or so of the Ingham homicide (Tr. 31), but never made any statement about "seeing anybody being chased up an alley" (Tr. 31, 32). He was never taken to see Ingham (Tr. 35).

Floyd also testified that it "was a very common occurrence to see a white person being chased up there . . . [T]here [was] nothing unusual about that at all [a]t that time. . . . [It was] [a]lmost a daily occurrence" (Tr. 40). He has seen about 30 similar occurrences in that same general vicinity. "Not only whites. They chase blacks, too." Out of the 30, "[m]aybe 20" were whites (Tr. 41).

an accused . . . Where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution," Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), or to withhold "evidence on demand of an accused which, if made available, would tend to exculpate him. . . ." *Id.* at 87–88, 83 S.Ct. at 1197.

We also agree with appellant's contention that "the prosecution may not suppress even the *means* of obtaining evidence." Appellant's Br. 24. Clearly, leads to *relevant* evidence cannot be withheld. As we said in Levin v. Katzenbach, 124 U.S.App.D.C. 158, 162, 363 F. 2d 287, 291 (1966):

> Thus [the defendant] would be entitled to relief in the present case if the government failed to disclose evidence which, in the context of this case, might have led the jury to entertain a reasonable doubt about [defendant's] guilt.

We added, however, that the Government was not "required . . . to disclose all its evidence, however insignificant, to the defense." *Id.* Much less should the Government be required to disclose evidence which appears to be irrelevant. Later, in Levin v. Clark, 133 U.S.App.D.C. 6, 408 F.2d 1209 (1967) we remarked that, while the standard would not be applied "harshly or dogmatically," it was to be applied in that case where the undisclosed evidence would have directly contradicted the testimony of two of the chief witnesses for the Government and "undermined seriously the prosecution's case."[9] There are also two instances, which appellant points to, where federal convictions have been reversed "because of the Government's failure to advise the defense that witnesses were available who had observed the crime and would testify that

the Defendant was not one of the persons perpetrating the incident." Appellant's Br. 26, citing United States ex rel Meers v. Wilkins, 326 F.2d 135 (2d Cir. 1964); Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968).

Finally, the Supreme Court in Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), in an opinion by Justice Blackmun, held that due process was not violated by the failure of the state to produce evidence that one witness had misidentified defendant where the misidentification was not material to the issue of guilt. In so deciding, the opinion prescribed the important criteria to a denial of due process:

> (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.

*Id.* at 794–795, 92 S.Ct. at 2568.

### III

It is appellant's contention here that the man being pursued at 11:30 P.M. was Ingham and that had the appellant been given the Bannister and Mickins statements prior to trial he would have been able to introduce the testimony of Floyd to establish that contention and that he would have obtained:

> the *means* for acquiring and establishing additional evidence which *might* have further buttressed the defense's contentions regarding the Defendant's lack of involvement with either the assault with intent to rob or the homicide.

Appellant's Br. 24 (emphasis added).

However, the testimony at the hearing on the instant motions confirmed the evaluation the police made at the time of

---

9. *Cf.* Xydas v. United States, 144 U.S.App. D.C. 184, 445 F.2d 660, cert. denied, 404 U. S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971), where we remarked that the withholding of

"information of ambiguous significance," where counsel was aware of other facts, was not reversible error.

the original investigation that the Bannister and Mickins statements were not relevant to the case, that they were not serious witnesses and that Ingham was not the man Floyd saw being chased. Floyd was consistent in saying, both at the instant hearing and in his interview with Detective O'Brien the day after the slaying, that the man he told Bannister and Mickins he saw being chased was not the murder victim. Detective O'Brien *on March 15, 1967* showed Floyd more than one photograph (Tr. 24), including a frontal photograph of Ingham taken before his death, and Floyd stated at that time that he did not recognize the person in the picture (Tr. 26–27).[10] This frontal photograph of the victim, and the other photographs showed to Floyd, could be better, but on examination they do seem to be an adequate basis for identification. The record also contains Floyd's statement that he observed the chase at 11:30 P.M.[11] On this hearing the evidence indicates that the victim did not die until 1 A.M. or later. On this point, both Mickins' 1967 statement and her testimony in the current proceedings clearly established that she had seen Ingham alive at 14th and R Streets, N.W., shortly after 1 A.M. on the 14th; and her identification of the body of the victim at the morgue was positive.[12]

██ Under such circumstances the testimony supports the conclusion that the statements and testimony of Bannister, Mickins[13] and Floyd did not include evidence that was relevant or material or that would be helpful to the defense or tend to exculpate Bowles and that the disclosure to appellant prior to trial of subject statements would not have led to evidence that was relevant or material or that would tend to be exculpatory. Following a full hearing at which the court had an opportunity to weigh the credibility of the witnesses, Judge

---

10. Floyd testified at the hearing as follows:
   Q You indicated back in 1967 that Lieutenant O'Brien and Officer Butler showed you a photograph?
   A Right.
   Q You also indicated you weren't sure whether you could recognize that photograph or not. I ask you, if you would, sir, to look at Government's Exhibit Number two. Does that look familiar to you?
   A This is the picture that they asked me about.
   Q And, you told them that you could not recognize that picture, is that right?
   A I did.
   Q And, is that a true statement?
   A It is a true statement.
   Q It was true when made?
   A It was true when made.
   Q And, it is true now, is that correct?
   A It is true now.
   Tr. of hearing of January 31, 1972, at 26–27. At one point Floyd had stated that he could not identify any or all of the photographs of Ingham as the person he saw being chased because the man was across the street and "I wasn't that close to him" (Tr. 18).

11. Following the 11:30 chase a paper bag was found on the street which contained a soldier's cap and some toilet articles. Floyd testified he never saw any person drop a bag. A bag was found on the ground by where the man being chased had run and Floyd went across the street and saw some people examining the bag. Floyd thought that some of those who were inspecting the bag "had . . . been chasing the man up the street. A. Evidentally [*sic*] they had, but they wasn't still chasing" (Tr. 7–10). Appellant works this event into his conjecture about the case, but the time of its occurrence positively removes it from events which occurred an hour and a half later. The contention that the admission of evidence of such chase might have led to appellant's acquittal is based on the further speculation that somehow irrelevant evidence might have been brought to the jury's attention. To rely upon irrelevant evidence to support a particular verdict falls within the "sporting theory of justice," which Justice Douglas in Brady v. Maryland, 373 U.S. 83, 90–91, 83 S.Ct. 1194, 1198, 10 L.Ed.2d 215 (1963), remarked "cannot [be] raise[d] . . . to the dignity of a constitutional right [that] denies him due process or violates the Equal Protection Clause of the Fourteenth Amendment."

12. *See* note 6, *supra*.

13. The record and briefs also spell the name as "Mickens" and "Nickins."

Gasch reached the same conclusion and we find his decision to be fully sustained by the record.[14]

Affirmed.

14. Appellant's guilt was established at trial principally by the testimony of Mary Burwell who lived with appellant's mother, Alice Johnson. The testimony of Mary Burwell described a conversation she and Alice Johnson had with appellant on the evening of March 14, 1967, in which he stated: "I killed a man (Tr. 58) . . . . [o]n R Street . . . in the back of an alley . . . it was a soldier" (Tr. 59). He showed a knife "like a dagger knife" (Tr. 60) and the police took a knife from him when they arrested him (Tr. 66, 88). One of his hands was swollen and he showed it to them in recounting the events (Tr. 90– C). Alice Johnson corroborated this testimony in its principal features, i. e., Bowles' statement that he had "killed a man last night" (Tr. 178). The testimony of these two women, and Mary Burwell in particular, includes a great deal of internal corroboration. The testimony corroborates the facts that were later proven, that it was a killing and not just a cutting, the exact place where the killing was committed, the general time of the killing (last night), the manner of the killing (knife), the identity of the victim (a soldier), and the ability of the appellant to kill in the manner described (the knife).