**UNITED STATES of America, Appellant,**

v.

**Rodney McCOY, Appellee.**

No. 72-1028.

United States Court of Appeals, District of Columbia Circuit.

Jan. 5, 1973.

Before Mr. Justice CLARK,[*] of the Supreme Court of the United States, and MacKINNON and ROBB, Circuit Judges.

## PER CURIAM:

Within thirty minutes following a robbery of Benson's Jewelry Store at 1319 F Street, Northwest, on September 19, 1970 by three young men, two suspects meeting the broadcast (lookout) description of the robbers [1] were arrested about nineteen blocks away with a plastic bag containing two trays of the stolen rings. They also had one gun meeting the description of the gun used in the robbery.[2] At the time of their arrest one of the suspects (not appellee) told the police officer who asked where they got the rings: "We . . . just robbed a junkie" (Tr. 126). The two suspects [3] were immediately returned to the scene of the robbery and were positively identified by the victim within about forty-eight minutes of the robbery. Appellee was subsequently indicted.[4]

At a suppression hearing held on September 27–29, 1971, just over a year following the crime, the trial judge suppressed an identification of appellee by the principal victim, Mr. Stein. The trial judge held

> that the circumstances of this identification were so unnecessarily suggestive as to create a likelihood of mistaken identity. There was confusion in the place, the witnesses have con-

Mr. Harold H. Titus, Jr., U. S. Atty., Messrs. John A. Terry, Philip L. Kellogg, and Robert E. L. Eaton, Jr., Asst. U. S. Attys., were on the brief for appellant.

Mr. Sherman L. Cohn, Washington, D. C., was on the brief for appellee.

[*] Mr. Justice Tom Clark, United States Supreme Court, Retired, sitting by designation pursuant to 28 U.S.C. § 294(a) (1970).

1. The "lookout" information was obtained from the complainant (Tr. 180) and broadcast. The arresting officer remembered the lookout information as follows: "The general broadcast was for three Negro males in their early twenties wearing black wet-look jackets" (Tr. 106). The exact "lookout" information broadcast over the police radio network stated: All units wanted for robbery holdup occurred about five minutes ago at 1319

F as in Frank North West. Negro male correction three Negro males in their early 20's all of them small build all of them had on black wet-look jackets two of them were armed obtained an undetermined amount. They were last seen inside the store at 1319 F Frank North West · . . . 16:41.
Govt. Ex. 1, p. 2.

2. One of the robbers hit a girl with his gun and caused her to fall to the floor (Tr. 51, 77).

3. A third suspect fled.

4. His alleged accomplice was a juvenile.

tradicted one another, and contradicted themselves in various testimony. Considering the whole matter, the totality of the circumstances, there is such a likelihood of unreliability that the defendant is deprived of due process. The motion to suppress identification is granted. Identification is suppressed. (Tr. 236–237)

The lengthy transcript has been completely read and studied and we find that the District Court was clearly in error in suppressing the identification.

Mr. Stein, the victim, was the Government's only eyewitness at the suppression hearing. He testified that the robbery consumed about five minutes and during part of this time he was forced to lie on the floor, but even then he was "watching" (Tr. 76). On two separate instances which totaled about two minutes, when he was standing, Mr. Stein had an opportunity to observe appellee under excellent lighting conditions. During one of these instances when the robber held a gun on Mr. Stein, only about 18 inches separated them. They were also within about 18 inches from each other when the robber searched Mr. Stein for weapons. On this occasion Mr. Stein was directly facing the robber. It is thus unquestioned that Mr. Stein had a good opportunity to observe the robber.

Following his arrest the police transported appellee and his accomplice back to the scene of the robbery in a patrol wagon. The lapse of time was sufficiently short so that this on-the-scene confrontation was a reasonable thing to do. Mr. Stein was then asked to come down from his office onto the street to see if he could identify any of the robbers. Nobody said anything to him about any of the men in the wagon (Tr. 88). He was not then told that the jewelry had been recovered. He was just asked, without any improper suggestion, to view the suspects to see if they were the persons responsible (Tr. 41, 42, 87, 88). The police even refused to reply to his inquiries as to whether "these are the guys that did the job. Have you got back my money?" (Tr. 100). The suspects were then presented to the victim in a manner that was scrupulously fair. Later he was given an opportunity and did identify the stolen jewelry (Tr. 84).

Mr. Stein viewed the two suspects while they were seated together in the rear of the patrol wagon and his identification was instantaneous and positive (Tr. 31, 45). "Those are two people that just held us up" (Tr. 45). He testified that he identified them by their features and that he knew positively that they were the men that held the gun on him (Tr. 98, 99).

Q Now, at that time when you looked into the end of that wagon, was there any question in your mind that those two men were the men on the left and the man in the middle?

A Not the slightest question.

Tr. 88.

One distinguishing characteristic of appellee was that he had a "little bit of a whiskers, very wispy" (Tr. 98). A "little mustache" (Tr. 52). "[A] little bit of a . . . beard . . . ." (Tr. 73). The arresting officers testified to the same identifying features (Tr. 146).

Another circumstance tending to support the reliability of the identification was the fact that Mr. Stein, a few minutes before these two suspects were presented to him, had refused to identify as one of the robbers another suspect produced by the police-radio broadcast (Tr. 189, 194).

■ At the time of the suppression hearing held a year following the robbery there was some discussion of appellee's eye condition. He apparently had some sight handicap (Tr. 56). After he was arrested on the day of the robbery he told the police he could not read and at the suppression hearing a year later he had a cane such as blind people use. However there is no evidence in the record that this sight handicap was an *observable* defect on the day of the robbery. It is unquestioned that appellee when first observed by the arresting of-

ficers on the day of the crime was walking without a cane, had no cane with him, was not stumbling and had no difficulty getting into the police wagon or subsequently in dialing a telephone number (Tr. 144–145). Also none of the arresting officers noticed anything unusual in appellee's characteristics (Tr. 136). Thus the fact that the victim in a two minute span, while the robber was moving about and participating in an armed robbery, did not observe a feature of appellee's eyes that was likewise not observed by the arresting officers who had a much better opportunity over a longer period of time on the same day to observe appellee leads to the conclusion that the feature of appellee's appearance, if it existed on that date, was not then sufficiently prominent so that the failure to observe it indicated any defect or deficiency in the powers of observation of the victim (the witness). It is likewise unquestioned that appellee *was* the person arrested with the loot in his possession shortly after the robbery.

There is also nothing in this record that indicates there was anything unduly suggestive in the circumstances of this identification. The so-called confusion amounted to nothing more than the presence of police and curious observers at the scene of the crime and did not in any way affect the identification. What is termed contradiction in testimony is nothing more than the usual slight variances which generally appear in all truthful testimony when several witnesses are testifying a year subsequent to events involving the actions of a number of people. In all essential details there was no substantial contradiction in the testimony.

■ Under the circumstances we conclude that the record indicates the identification fully conformed to due process requirements and was reliable and fully admissible for jury consideration in the trial of the case in line with our holdings in Russell v. United States, 133 U.S.App.D.C. 77, 408 F.2d 1280, cert. denied, 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969) and United States v.

Hines, 147 U.S.App.D.C. 249, 255, 455 F.2d 1317, 1323 (1971), cert. denied, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972). The trial court's conclusion to the contrary was clearly erroneous and is

Reversed.