**Vincent A. MARCH, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 8850.**

District of Columbia Court of Appeals.

Argued Feb. 5, 1976.

Decided July 14, 1976.

Richard S. Greenlee, Washington, D. C., appointed by the court, for appellant. Frederick H. Weisberg, Washington, D. C., appointed by the court, also entered an appearance for appellant.

John L. Kern, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Stuart M. Gerson, and Martin J. Linsky, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before REILLY, Chief Judge, and HARRIS and MACK, Associate Judges.

HARRIS, Associate Judge:

Appellant was charged with single counts of sodomy and assault with intent to commit rape. D.C.Code 1973, §§ 22–3502 and 22–501. A jury found him guilty of both offenses. He challenges those convictions on several evidentiary grounds arising generally from his defense of misidentification. We affirm.

I

The case stems from events which transpired on October 29–31, 1973, within a narrow area of the George Washington University campus. During that 48-hour period, three women students were subjected to separate sexual assaults. The testimony of the victims and several other witnesses reveals that shortly after 8:00 p. m. on Monday, October 29, appellant approached Denise Mindlin Schattman in the hallway of her apartment building and exposed his penis. Immediately following this incident, he was observed strolling across the street in front of the building by Schattman, her roommate, Patricia Schub (who had seen appellant's back as he fled the hallway), and their resident manager, Nancy Lee Uhaize (who had been notified of the incident by Schattman and Schub). Some minutes later, appellant was seen entering an alley behind a woman whose description matched that of the ultimate complainant (whose name need not be used in this opinion). She testified that at approximately 8:30 p. m., as she passed through that alley on the way to the drug store, appellant put his arm around her and exposed his penis. She returned from the store by a different route, but again was accosted by appellant. He choked her and made clear his intention to rape her. Apparently dissuaded from rape by his discovery that she was menstruating, he forced her to perform fellatio.

Detective Oliff of the Metropolitan Police Department responded to both complaints. He first interviewed the complainant at the University security office, where he took some notes on a 3 x 5-inch card and had a broadcast made of the assailant's general description. The officer then interviewed the women at the apartment building.

On Wednesday, October 31, at approximately 6:30 p. m., appellant followed Schub (who had seen him on Monday evening) into her apartment building and reached up her dress. He then fled out the door, by

chance past Detectives Oliff and Orman who were arriving to show the women a selection of photographs of possible suspects in the Monday assault on Mrs. Schattman. Shortly thereafter, appellant was apprehended and returned to the apartment building. In overlapping confrontations he was identified positively by Schattman, Schub, and Uhaize. As he was being taken from the building to an unmarked police cruiser, complainant, who happened to be passing by, immediately recognized appellant and positively identified him as her assailant.

Only the sodomitic attack was charged. Appellant's theory of defense was misidentification. At an extensive pretrial hearing, appellant's trial counsel made unsuccessful motions for the production of both the 3 x 5 card on which Detective Oliff had made his initial notes and the array of photographs which the officers had shown to Schattman, Schub, and Uhaize.[1] Although the government was unable to produce either the card or the array, the court declined to impose any evidentiary sanction. The court also refused to exclude certain photographs of the scene of the crime, although it was acknowledged that several of them did not reflect actual lighting conditions at the time of the assault. However, out of an abundance of caution, the court ruled that the Wednesday confrontations between appellant and Schattman, Schub, and Uhaize had been impermissibly suggestive, and agreed that any testimony as to the uncharged assaults would be prejudicial. The court therefore placed certain limitations on the scope of both the direct testimony and the cross-examination of the prosecution's witnesses. At the conclusion of the trial, after two hours of deliberation, the jury returned verdicts of guilty on both charges.

Appellant now challenges (1) the limitations placed on his cross-examination of the government's witnesses as a denial of his Sixth Amendment right to confrontation; (2) the refusal to impose any sanction for the nonproduction of the detective's notes and the array of mugshots as violative of the principles of the Jencks Act, 18 U.S. C. § 3500 (1970), and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (3) the admission of the photographs of the scene as a prejudicial abuse of discretion. We find no merit in these contentions.

## II

█ Appellant's first argument is that the trial court improperly restricted his cross-examination of several of the government's witnesses.[2] He asserts that the court's rulings limiting inquiry into the events of Wednesday evening effectively precluded his attempts to impeach the identification testimony of those witnesses, and thereby erroneously impinged on his right to cross-examination.[3] *See Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Alford v. United States,* 282 U. S. 687, 691, 51 S.Ct. 218, 75 L.Ed. 624

1. Appellant's picture was not included in the array which was shown to the witnesses. Apparently this was the reason for its nonpreservation.

2. While appellant contends that the court's ruling prejudiced his cross-examination of all of the women who identified him during the Wednesday showups, the focus of his objection is his asserted inability to impeach Uhaize's in-court identification on the basis of inconsistent statements allegedly made by her at the time of the showups.

3. Because of the value of cross-examination in the determination of the truth, an op-

portunity for its effective use as a means of testing the government's case is guaranteed to the accused. *See Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed. 347 (1974); *Smith v. United States,* D.C.App., 330 A.2d 519, 520 (1974); *Lindsey v. United States,* 77 U.S.App.D.C. 1, 2, 133 F.2d 368, 369 (1942). This right to cross-examination, however, is not unfettered, for the extent of its exercise rests in the sound discretion of the trial court. *See, e. g., Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

(1931); *Howard v. United States,* 128 U.S.App.D.C. 336, 341, 389 F.2d 287, 292 (1967). We disagree.

■ The challenged limitations on the witnesses' testimony were imposed by the court in response to appellant's own pre-trial motions.[4] Appellant nevertheless now asserts that those rulings forced him to choose between abandoning his claim that Uhaize's in-court identification was based on an unduly suggestive confrontation, and waiving his opportunity to cross-examine the witness as to the circumstances of the pretrial identification. Neither his characterization of the effect of the court's rulings nor his claim of prejudice finds support in the record.

Defense counsel could and did freely cross-examine Uhaize concerning her in-court identification of appellant. That identification was made, consistent with the trial court's ruling, on the basis of the witness' Monday observations, which were independent of the Wednesday encounter. *See United States v. Wade,* 388 U.S. 218, 239–43, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The record reveals both a reasonable opportunity to test Uhaize's in-court identification, and sufficient inquiry into the matter to provide the trier with "a satisfactory basis for evaluating the truth." *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed. 213 (1970); *see Hyman*

*v. United States,* D.C.App., 342 A.2d 43, 44 (1975).

Moreover, the court did not prevent appellant from exploring the asserted inconsistencies in the statements made by the witnesses at the time of the showups. The court simply concluded that if appellant chose to explore the statements made during the Wednesday encounter between appellant and the witnesses at the apartment building, the entire transaction would be open to inquiry; that is, appellant would not be permitted to pick and choose among the facts of the Wednesday confrontation. *Cf. Davis v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed. 347 (1974); *Hood v. United States,* 125 U.S.App.D.C. 16, 18–19, 365 F.2d 949, 951–52 (1966); *Iva Ikuko Toguri D'Aquino v. United States,* 192 F.2d 338, 371 (9th Cir. 1951). Such a ruling was within the authority of the trial court. *See Alford v. United States, supra,* at 694, 51 S.Ct. 218; *Best v. United States,* D.C.App., 328 A.2d 378, 381 (1974); *Howard v. United States, supra,* 128 U.S.App.D.C. at 341, 389 F.2d at 292. For obvious tactical reasons defense counsel chose to avoid the potentially prejudicial transaction. As the dimensions of his cross-examination thus were essentially of his own making, appellant cannot now be heard to complain that that opportunity was inadequate. *Cf. Clemons v. United States,* 133 U.S.App.D.C. 27, 34, 408 F.2d 1230, 1237 (1968), *cert.*

4. Defense counsel moved to exclude any identification testimony based on the Wednesday evening showups (which, it should be noted, occurred not by police design, but by appellant's return to the scene of the assaults). Following an extensive hearing, the court ruled that the encounters had been unduly suggestive. *See generally Neil v. Biggers,* 409 U.S. 188, 196–201, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Schattman, who had been assaulted in the uncharged Monday incident, was limited to a general description of the man she had seen in the area of the alley on that night. The suggestivity of the showup did not affect the testimony of Schub, however, who had been sexually assaulted immediately prior to the disputed confrontation on Wednesday. *See United States v. McCoy,* 154 U.S.App.D.C. 233, 475

F.2d 344 (1973). Nevertheless, the court ruled that because of the inherent prejudice of the uncharged incidents, Schub's testimony would be subject to the same strictures as that of Schattman. Only Uhaize was to be permitted to make an in-court identification of appellant. The court concluded that she had had a sufficient opportunity to observe appellant on Monday to enable her to make the identification independently of the tainted showup. *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *see also Clemons v. United States,* 133 U.S. App.D.C. 27, 408 F.2d 1230 (1968), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed. 2d 567 (1969). Appellant's trial counsel made no objection to the court's determinations.

*denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L. Ed.2d 567 (1969); *Smith v. State,* 6 Md. App. 59, 250 A.2d 285, 292 (1969), *cert. denied,* 397 U.S. 1057, 90 S.Ct. 1402, 25 L.Ed. 2d 674 (1970).

■ Finally, appellant has failed to demonstrate the prejudicial impact of the disputed rulings *See Harris v. United States,* 367 F.2d 633, 636 (1st Cir. 1966). Regardless of Uhaize's testimony, the identification of appellant by the complainant was positive, detailed, and unimpeached. The disputed identification therefore was not critical to appellant's conviction. *See Best v. United States, supra,* at 383. *Compare Davis v. Alaska, supra,* at 319, 94 S.Ct. 1105; *Dutton v. Evans, supra,* at 87–88, 91 S.Ct. 210; *Douglas v. Alabama,* 380 U.S. 415, 419–20, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Even were we persuaded that the partial limitation on cross-examination was error, we would have no doubt that absent the court's rulings the outcome of the adjudication would have been the same. *See Best v. United States, supra,* at 382–83; *see also Hampton v. United States,* D.C. App., 318 A.2d 598 (1974); *United States v. Pugh,* 141 U.S.App.D.C. 68, 71–72, 436 F.2d 222, 225–26 (1970).

## III

■ Appellant's second argument is that the trial court erred in refusing to strike the testimony of both the complainant and

Detective Oliff as a sanction for the government's inability to produce the 3 x 5 card upon which the officer had made notes during his initial interviews with the complainant and several other witnesses on Monday.[5] The detective testified that the missing card contained the following notations:

> Negro male 16–25 years of age. Slim build, 5'8" to 5'9". Black leather three-quarter length jacket and dark trousers.[6]

It is appellant's contention that these notes fell within the ambit of the Jencks Act, 18 U.S.C. § 3500 (1970), and that the nonproduction of the card required the exclusion of certain testimony by the government's witness. *Id.* § 3500(d). We find both the premise and the conclusion to be without merit.

■ In their arguments before this court, both parties have focused their discussion of the Jencks Act issue on considerations such as the alleged negligence or bad faith of the officer, who threw away his original notes after using them for a radio run and in the preparation of a P.D. Form 251 (both of which were provided to the defense), and whether the absence of the original 3 x 5 card was sufficiently prejudicial to warrant the imposition of any evidentiary sanction. Such inquiries, however, presuppose an affirmative answer to the necessary initial question of whether the detective's card fell within the narrow limits of the Jencks Act at all.[7] The thresh-

---

5. While appellant's objections are directed at the testimony of the complainant and Detective Oliff, the Jencks Act's sanctions, if applicable, fall solely upon the testimony of the out-of-court declarant, and not upon the testimony of the individual who recorded the prior statement. *Hardy v. United States,* D.C. App., 316 A.2d 867 (1974).

6. Detective Oliff explained that in his initial interviews with the women he sought to get a general description of the assailant in order to broadcast a lookout. Subsequent interviews with Uhaize and Schattman on the same evening yielded descriptions similar to that given by the complainant; accordingly, the officer made no new entries on the 3 x 5 card other than to add the fact that the

suspect may have had a small flashlight hanging from his belt.

7. We have declared: "Where a discoverable statement has been lost or destroyed and hence is not in the government's possession, a trial court must weigh certain factors [*e. g.,* the actions of the officer and the potential prejudice to the accused] in exercising its discretion whether to strike a witness' testimony." *Hardy v. United States, supra* note 5, at 870. The prerequisite to any such balancing, however, is a prior determination that the requested document is a "statement" and is, in fact, "discoverable".

Our concurring colleague, in declining to join in this portion of the opinion, places

old issue of the applicability of the Jencks Act to a particular set of investigative notes is wholly independent of the bona fides of the officer or any potential prejudice to the accused.[8]

■■■ It is by no means obvious that the Jencks Act is applicable to the notes in dispute—and the trial court did not expressly rule that it was. The Act is a limited statutory scheme which serves the concurrent purposes of aiding the search for truth by facilitating the impeachment of a witness who has given a statement to the government, while at the same time regulating access by the defense to materials and evidence within the government's possession. *See Palermo v. United States,* 360 U.S. 343, 354, 79 S.Ct. 1217, 3 L.Ed.2d 1287

(1959); *Hardy v. United States,* D.C. App., 316 A.2d 867, 869 (1974); *United States v. Dockery,* D.C.App., 294 A.2d 158, 161 (1972); *United States v. Catalano,* 491 F.2d 268, 274 (2d Cir.), *cert. denied,* 419 U. S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974). The statutory provisions are unambiguous both as to the Act's scope and the prerequisites to its applicability.[9] Where, as here, the defense has requested certain material from the government, the first appropriate inquiry is whether the particular item falls within the provisions of the Act, for "writings must be produced only to the extent they are 'statements' as defined [in the Act] . . . ." *Goldberg v. United States,* 425 U.S. 94, 96 S.Ct. 1338, 1345, 47 L.Ed.2d 603 (1976). Only when the trial court has satisfied itself that the requested item con-

considerable emphasis on the fact that neither party to this appeal has expressly challenged the trial court's implicit determination that the disputed notes fell within the ambit of the statutory scheme. However, where, as here, the sole authority for the disputed action of the trial court rests upon statutory provisions, any proper resolution of challenges to the manner in which the statute was applied necessarily includes inquiry as to whether the statute should have been applied at all. Even were we able to agree that the issue of whether the disputed material fell within the Jencks Act was not implicit in the arguments made to this court, our authority and responsibilities as an appellate court are not bounded by the manner in which the parties have chosen to cast their arguments. We share the views of the Supreme Court expressed in *Silber v. United States,* 370 U.S. 717, 718, 82 S.Ct. 1287, 1288, 8 L.Ed.2d 798 (1962) :

"In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings." [Quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936).]

8. Similarly misdirected is appellant's emphasis on the allegedly intentional disregard by Detective Oliff of the police regulations which call for the preservation of investigative material. Appellant cites Metropolitan Police General Order Series 601, No. 2 (effective May 26, 1972, as amended, Sept. 1, 1972),

which requires the retention of "potentially discoverable material", such as the statements of prospective witnesses, and specially states that "this includes an officer's rough note of the description of the perpetrator of a crime given by the victim or witness prior to the arrest of a suspect." Despite such unambiguous language, the fact that Detective Oliff normally made a practice of transferring the data from his rough notes into a notebook (which was not done on this occasion), and then throwing away the originals, is irrelevant to the issue of the applicability of the Jencks Act. However desirable the policy embodied in the Police General Orders may be, these regulations cannot be construed as extensions or modifications of the statutory language. Internal mandates such as these orders properly are to be enforced by the appropriate authorities within the department, and not by appellate courts which have no direct supervisory authority over such day-to-day law enforcement activities. *See Moore v. United States,* D.C.App., 353 A.2d 16, 24 (Harris, J., dissenting). *Cf. Hardy v. United States, supra* note 5, at 870.

9. In addition to the language of subsection (e), which narrowly defines those "statements" to which the provisions of the Act are to extend, the statute further restricts its applicability by indicating that the extrinsic materials must be (1) in the possession of the government, (2) expressly requested by the defense after the affected witness has provided direct testimony for the prosecution, and (3) entirely related to the subject matter as to which the witness has testified. 18 U.S.C. § 3500(b) (1970).

stitutes "Jencks material"[10] should it address the question of the nonproduction of the evidence by the government and any possible sanction therefor.[11]

The Jencks Act provides [18 U.S.C. § 3500(e) (1970)]:

> The term "statement", as used in . . . this section in relation to any witness called by the United States means—
>
> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> (2) a stenographic, mechanical, electrical, or other recording, or transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of said oral statement; or
>
> (3) a statement, however, taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

The only language under which the detective's notes possibly could be considered to be Jencks Act material is that of subsection (2), which contains the concurrent provisions that the requested material must have been recorded contemporaneously and must constitute a substantially verbatim recital of the prior oral statement. *Cf. Goldberg v. United States, supra* [construing subsection (e)(1) of the Act]. We have no doubt that the notes taken during the initial interview with the complainant were possessed of the necessary contemporaneity. We agree, however, with Mr. Justice Powell's observation in his concurrence in *Goldberg*: "Typical interview notes are selective—even episodic—and therefore fall outside of subsection (e)(2)." 96 S.Ct. at 1355. Hence, we are not convinced that the abbreviated notations made by Detective Oliff fairly may be described as a "substantially verbatim recital" of the witness' statement.[12] *See In re A.B.H.,* D.C. App., 343 A.2d 573, 575 (1975); *United States v. Hines,* 147 U.S.App.D.C. 249, 455 F.2d 1317 (1971), *cert. denied,* 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972). *See also In re R.D.J.,* D.C.App., 348 A.2d 301 (1975). Congress was careful to provide a detailed explanation of the type of statements which would be subject to the Act, and it does not appear that a police officer's investigative notes—such as those taken here on a 3 x 5-inch card—would fall within the legislative contemplation. *See generally Palermo v. United States, supra,*

---

10. 18 U.S.C. § 3500(c) (1970) provides that the court may examine the disputed material in camera to determine the Act's applicability. Despite appellant's vigorous arguments to the contrary, the mere fact that the court does not have the requested items before it does not necessarily preclude the crucial preliminary determination of whether the evidence satisfies the prerequisite definition of a "statement" and thus falls within the reach of the Act. *See Johnson v. United States,* D.C.App., 322 A.2d 590 (1974); 18 U.S.C. § 3500(e) (1970). *See also Campbell v. United States,* 365 U.S. 85, 92–93, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961). Where, as here, both the declarant and the recorder of the disputed remarks are available to describe the prior interview, and there exist extrinsic indicia of the reliability of their recollections (*i. e.,* the transcribed radio run and the police report form), the court has an adequate factual basis upon which it may determine the applicability of the Jencks Act. *Cf.*

*Goldberg v. United States, supra,* 96 S.Ct. at 1353–55 (Powell, J., concurring).

11. "The producibility of a statement depends upon its being within the particularities of the statute [the Jencks Act]." *Matthews v. United States,* 407 F.2d 1371, 1376 (5th Cir. 1969), *cert. denied,* 398 U.S. 968, 90 S.Ct. 2177, 26 L.Ed.2d 554 (1970). Of course, once it is concluded that a requested item constitutes Jencks Act material, the burden of producing it or justifying its unavailability falls on the government. *See United States v. Augenblick,* 393 U.S. 348, 355–56, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969).

12. Detective Oliff testified that he had made the notes in order to broadcast the general description of the assailant and begin his investigation. He did not suggest that his efforts amounted to a verbatim account, and he noted that he left out complainant's remarks concerning the suspect's sideburns.

at 351–54, 79 S.Ct. 1217.[13] As such materials normally are but abbreviated characterizations and summaries of a witness' actual comments, the notes would rarely, if ever, rise to a degree of completeness (*i. e.*, "substantially verbatim") sufficient to satisfy the rigorous prerequisites of the Act. *See In re A.B.H., supra,* at 575; *United States v. Scriber,* 163 U.S.App.D.C. 36, 43, 499 F.2d 1041, 1048 (1974); *United States v. Hines, supra,* at 264, 455 F.2d at 1332. *See also United States v. Augenblick,* 393 U.S. 348, 354–55, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969) (holding that the loss of both notes and tape recordings of interviews with government witnesses did not constitute a denial of due process).

■ Appellant's reliance on *United States v. Bryant,* 142 U.S.App.D.C. 132, 439 F.2d 642 (1971), is misplaced. There the initial issue of the applicability of the Jencks Act easily was resolved by virtue of the fact that the disputed materials consisted not of an officer's rough notes, but of the actual tape recordings of the defendants' conversations with an undercover police officer. *See* 18 U.S.C. § 3500(e)(2) (1970). It is true that the *Bryant* court indulged in expansive dicta intended to suggest that the separate and distinct constitutional doctrine of *Brady v. Maryland, supra,* could be utilized to extend the reach of the limited statutory scheme. *But see Moore v. United States, supra,* note 8, 353 A.2d at 27–28 (Harris, J., dissenting).[14] Since *Bryant,* however, the circuit court itself has been unable to manifest a consistent philosophy concerning an officer's lost rough notes, notwithstanding the rulings of the Supreme Court in *Palermo v. United States, supra,* and *United States v. Augenblick, supra.*[15] In any event as the *Bryant* principles upon which appellant relies so heavily were mere dicta, they are not binding upon us, notwithstanding that decision's issuance shortly before the effective date of the Court Reorganization Act.[16]

■ It is, of course beyond doubt that a single piece of evidence could be both

---

13. In holding the Jencks Act inapplicable to a memorandum which summarized an officer's interrogation of the witness, the *Palermo* Court focused on the "continuous congressional emphasis" on "substantially verbatim recital[s]" and "continuous, narrative statements". 360 U.S. at 352, 79 S.Ct. 1217.

Mr. Justice Stevens, referring to both subsections (e)(1) and (e)(2) in his concurrence in *Goldberg v. United States, supra,* expressed the following view which we share (93 S.Ct. at 1349):

Whether a particular writing is an original or a copy, it is not a statutory "statement" unless it reflects the witness' own words fully and without distortion.

14. In *Brady,* the Court was confronted with a murder prosecution in which the government had withheld a confession by the petitioner's codefendant. It was held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. The Jencks Act, however, is not constitutional dogma; it merely establishes a rule of evidence. *See United States v. Augenblick, supra,* at 356, 89 S.Ct. 528.

In its unfortunate blurring of the separate mechanisms for criminal discovery, the *Bryant* court also relied in part on Fed.R. Crim.P. 16, which is applicable solely to the pretrial stages of a criminal proceeding and cannot properly be considered in conjunction with the Jencks Act's provisions, which do not come into play until after a particular witness "has testified on direct examination in the trial of the case." 18 U.S.C. § 3500 (a). *See United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *United States v. Harris,* 458 F.2d 670, 679 (5th Cir.), *cert. denied,* 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972). *See also United States v. Dockery, supra.*

15. *Compare United States v. Mason,* 173 U.S. App.D.C. 173, 523 F.2d 1122 (1975), *United States v. Scriber, supra, and United States v. Hines, supra, with United States v. Harrison,* 173 U.S.App.D.C. 260, 524 F.2d 421 (1975).

16. District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358 (July 29, 1970) (effective Feb. 1, 1971). *See M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971); D.C.Code 1973, §§ 11–101 *et seq.* We readily concur in the actual holding in *Bryant.*

"exculpatory" for purposes of the *Brady* doctrine and a "statement" under the Jencks Act. Nonetheless, the mere fact that the disputed material allegedly may be favorable to the accused is irrelevant to the essential first question of whether that particular item constitutes a "statement" as defined in 18 U.S.C. § 3500(e). Appellant's Jencks Act argument must stand or fall independently of any *Brady* claim he may have.[17]

With the same caution with which he restricted testimony as to the uncharged sexual assaults, the trial court eschewed ruling that the missing 3 x 5 card was not a statement under the Act, although its

cursory nature and obvious adherence to a police format make it likely that such a ruling would have been proper.[18] The record reveals that in resolving defense counsel's arguments based upon the *Bryant* dicta, the trial court considered both the circuit court's moderation of the *Bryant* principles in *United States v. Perry*, 153 U.S.App.D.C. 89, 471 F.2d 1057 (1972),[19] and the relevant Jencks Act decisions rendered by this court.[20] The apparent grounds for the denial of appellant's motion were expressed as follows:

So, in this case the police officer testified that he did check the 251. It covered the notes that he made and he

17. While the thrust of his argument is directed toward his Jencks Act claim, appellant also appears to suggest that the disputed 3 x 5 card would be "favorable" to his defense and thereby was subject to the principles of *Brady v. Maryland, supra*. It is urged that the original notes would prove exculpatory in nature by their substantiation of alleged inconsistencies in the identification testimony of the government's witnesses. We have carefully examined the entire record and find no merit in that suggestion. Where, as here, the proffered inconsistencies are trivial, were fully explored during cross-examination, and stand dwarfed beside the positive and detailed identification testimony of the complainant and several other corroborative witnesses, it cannot be said that the evidence rises to the level of materiality contemplated by *Brady v. Maryland, supra*. *See Moore v. Illinois*, 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *United States v. Scriber, supra*.

18. We quote with approval in more detail from Mr. Justice Powell's concurring opinion in *Goldberg v. United States, supra* (96 S.Ct. at 1355–56):

In applying the Jencks Act to typical interview notes alleged to have been "adopted or approved" by a witness, we must remember that such notes do not fit within the core of the Jencks Act. Subsection (e)(1) includes "*written statement[s] made by* [the] witness and signed or otherwise adopted or approved by him." Subsection (e)(2), not relied upon in this case, requires a "substantially verbatim" reproduction of an "oral statement made by [the] witness and recorded contemporaneously." Typical interview notes are selective—even episodic—and therefore fall outside of subsection (e)(2). Even if "adopted or approved" by the witness, such

notes were not written by the witness himself and therefore fall without the core of subsection (e)(1). Typical interview notes that allegedly have been "adopted or approved" thus lack important guarantees of dependability that Congress relied upon in the central concept of subsections (e)(1) and (e)(2). These guarantees, it should be noted, arise partly from the sense that a witness normally would have of "going on the record" when he makes a statement within the core of subsection (e)(1) or subsection (e)(2). It is to supply a comparable guarantee of dependability that the witness should know he is adopting the interview notes as a formalized statement. [Footnotes omitted.]

19. *Perry*, like *Bryant*, involved the loss of material clearly within the Act's definition of a "statement", rather than evidence in the form of rough, investigative notes. The *Perry* court nevertheless interposed as a prerequisite to consideration of sanctions for the challenged nonproduction a showing of culpable negligence or bad faith on the part of the government. *United States v. Perry, supra*, at 95–98, 471 F.2d at 1063–66. *See United States v. Covello*, 410 F.2d 536, 545 (2d Cir. 1968), *cert. denied*, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969) (good faith destruction does not require a new trial); *United States v. Jones*, 360 F.2d 92, 95 (2d Cir. 1966), *cert. denied*, 358 U.S. 1012, 87 S.Ct. 721, 17 L.Ed.2d 549 (1967) (good faith destruction does not require striking of agent's testimony).

20. For a chronological examination of the relevant decisions, both prior and subsequent to the denial of the motion in this case, *see Moore v. United States, supra* note 8, 353 A.2d at 26–27 (Harris, J., dissenting).

just destroyed the notes as having no further purposes. There is no indication here that it was bad faith in any way. In addition to that, there's no indication there's any prejudice to the defense.

▇▇▇▇ Despite our reservations concerning the applicability of the statutory provisions to the note card in the first place, we do not disturb the trial court's ruling. The Supreme Court has declared:

> [T]he administration of the Jencks Act must be entrusted to the "good sense and experience" of the trial judges subject to "appropriately limited review of appellate courts." [*United States v. Augenblick, supra,* at 355, 89 S.Ct. at 533, quoting *Palermo v. United States, supra,* at 353, 79 S.Ct. 1217. *See also Campbell v. United States,* 373 U.S. 487, 493–95, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963).]

It is apparent, therefore, that a "clearly erroneous" standard is the appropriate measure by which we are to review the trial court's conclusions both as to whether by virtue of their contemporaneous and substantially verbatim qualities the requested material falls within the reach of the Act, and, if so, whether the circumstances warrant the imposition of any sanction for the government's failure to produce the document. *See* D.C.Code 1973, § 17–305 (a); *see also United States v. Perry, supra,* at 95, 471 F.2d at 1063. The trial court treated the detective's notes as though they fell within the scope of the statutory pro-

visions, but concluded that as there was neither bad faith on the part of the officer nor any prejudice to the defendant, the nonavailability of the evidence in its original form did not warrant the imposition of any sanction. Although, as we have indicated, we would not have concluded that the information contained on the note card constituted a "statement" as contemplated by the Act, in light of the applicable standard of review and the fact that the ultimate result would be unaffected, we see no reason to set aside the court's conclusions.[21]

## IV

▇▇▇ Appellant's third contention on appeal is that the trial court erred in failing to impose a sanction for the government's nonproduction of the photographic array which the investigating officers had shown to Schattman, Schub, and Uhaize. Six to ten photographs, none of which was of appellant, were shown to the women on Wednesday, immediately before appellant was apprehended as a consequence of his return to the scene. The witnesses made no positive identification from the array, but selected at least one picture as bearing some similarity to the perpetrator of the sexual assaults. The collection of mug-shots apparently was not preserved by the police after they had taken appellant into custody and he had been positively identified by the complainant and the three other witnesses. Appellant contends that the mere possibility that the missing photo-

---

21. Our concurring colleague appears quite willing to conclude as a matter of fact that the missing note card was a "statement", although the trial court did not expressly so hold. Bearing in mind that subsection (e)(2) requires that a "statement" must be "a substantially verbatim recital of an oral statement made by said witness", we could accept our colleague's conclusions only if we were willing to believe that the distraught victim of a sodomitic attack actually would have expressed herself to the responding officer in the following manner:

"Negro male, 16–25 years of age. Slim build, 5′ 8″ to 5′ 9″. Black leather three-

quarter length jacket and dark trousers." [Testimony of Detective Oliff; *see* page 8, *supra.*]

We cannot make that leap of faith.

Moreover, although in *Goldberg v. United States, supra,* the disputed notes had been taken by the prosecutor in an interview of a prospective witness, when one considers the degree of precision required by the unanimous Court in that case for a proper application of the Act, it appears highly improbable that the "cop on the beat" interviewing a victim of crime could achieve a "substantially verbatim" recording of an oral statement merely by jotting down a few words on a small card.

graphs might have revealed an image so dissimilar to his actual appearance that they could have discredited the identification testimony of the witnesses placed the array within the ambit of *Brady v. Maryland, supra.* (*See* note 14, *supra.*) We disagree.

We need not indulge in the ambitious speculation suggested by appellant, for the remote possibility that the evidence which the government failed to produce might have been favorable to the defense is not, by itself, sufficient to invoke the principles of *Brady.* The Supreme Court has held that it is the materiality of disputed items, when considered in the context of the entire case, which determines the government's due process duty of production. *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).[23] *See United States v. Sedgwick,* D.C.App., 345 A.2d 465, 473 (1975); *Marshall v. United States,* D.C.App., 340 A.2d 805, 809 (1975).

The identification testimony upon which appellant was convicted was provided by four witnesses, each of whom had had at least two opportunities within a 72-hour period to observe appellant at close range. *Cf. Neil v. Biggers,* 409 U.S. 188, 196–201, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The most damaging testimony was that of the complainant, who, by the nature of the violent assault upon her, unfortunately had an extended opportunity to observe her assailant. As the victim never was shown the disputed array, her positive and detailed identification of appellant was unaffected by appellant's objection. While the testimony of the other three women was, therefore, merely corroborative, it was equally sure and thoroughly tested by cross-examination. *Cf. Hyman v. United States, supra,* at 44. Moreover, the jury was fully apprised of the fact that the witness Uhaize had indicated the possibility of similarities between the fugitive and a photograph which was not of appellant.[24] *Cf. Marshal v. United States, supra,* at 808–09. We are convinced that the missing array was not of sufficient materiality to warrant application of the *Brady* doctrine.

This is not to say · that the array of photographs should not have been preserved.[25] Indeed, were it possible to have a system free of the constraints of finite resources and human fallibility, all of the bits and pieces of evidence—whether frivolous[26] or ultimately productive—which make up the investigatory evolution of a criminal case should be preserved and made available for proper defense inquiry. However, neither this general desirability nor the existence of administrative mandates such as the Police General Orders raises the question to the level of due

---

23. In *Moore* the Court held that due process principles were not violated by the failure of the state to produce evidence that one witness had misidentified the defendant where such misidentification was found to be immaterial to the issue of guilt. The Court focused its due process analysis on three elements: (1) the suppression of the evidence by the prosecution after a request by the defense, (2) the favorable character of the evidence to the defense, and (3) the materiality of the evidence. 408 U.S. at 794–95, 92 S.Ct. 2562.

24. Moreover, Detective Oliff testified that the photograph tentatively identified by Uhaize did not resemble appellant.

25. Metropolitan Police General Order Series 304, No. 7, effective December 1, 1971 (revised November 25, 1974), provides in pertinent part: "Adequate records of the photographs shown to each witness must be kept so that the exact group of photographs from which an identification was made can be presented in court at a later date to counteract any claim of undue suggestion and enhance the reliability of in-court identification. This information shall be recorded in the statement of the facts of the case." It should be noted that none of the witnesses made a positive identification from the disputed array, and that Schattman and Schub were not permitted to make in-court identifications. The court had previously ruled that Uhaize could make an in-court identification because of the independent source therefor (the events of Monday evening).

26. *See, e. g., United States v. Sedgwick, supra,* at 474.

process significance.[27]  As the Supreme Court has stated:

> We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. [*Moore v. Illinois, supra,* 408 U.S., at 795, 92 S.Ct., at 2568.]

The issue before us is simply whether the failure to produce photographs which were employed during the initial investigation but which were abandoned following an unrelated apprehension of the suspect has, within the factual context of this particular case, achieved the magnitude of a constitutional deprivation.  We readily conclude that it has not.  *See United States v. Scriber, supra.  Cf. Swann v. United States,* D.C.App., 326 A.2d 813 (1974); *United States v. Bowles,* 159 U.S.App.D.C. 407, 413, 488 F.2d 1307, 1313 (1973), *cert. denied,* 415 U.S. 991, 94 S.Ct. 1591, 39 L. Ed.2d 888 (1974).

## V

Finally, appellant contends that the trial court erred in admitting a series of photographs which depicted the general scene of the assault.  The admission of photographic evidence rests within the sound discretion of the trial judge, "who is in the best position to determine whether [the photographs] properly reflect the testimony or the circumstances sought to be depicted." *Mann v. Robert C. Marshall, Ltd.,* D.C.App., 227 A.2d 769, 771 (1967); *see D. C. Transit System, Inc. v. Acors,* D. C.App., 293 A.2d 871, 873 (1972); *Simms v. Dixon,* D.C.App., 291 A.2d 184, 186 (1972).  The relevancy of the exhibits is not contested; rather, appellant argues that because the lighting revealed in several

of the photographs was somewhat different from the actual conditions on the night in question, it was an abuse of discretion to admit such evidence.  We disagree.

The admission of photographic evidence does not require that the exhibits perfectly mirror the facts or conditions to be presented to the trier.  The question to be resolved is whether the jury adequately was apprised of whatever factual variances may have existed between reality and its purported reproduction. *See Washington Coca Cola Bottling Works v. Kelly,* D.C.Mun.App., 40 A.2d 85, 87 (1944); *Luther v. Maple,* 250 F.2d 916, 921 (8th Cir. 1958).  The record reveals that the complainant provided a minutely detailed explanation of the differences in the lighting conditions, and that the court properly cautioned the jury concerning the variance. *Cf. Commonwealth v. Pitts,* 450 Pa. 359, 301 A.2d 646, 650 (1973).  The photographs properly were admitted.

*Affirmed.*

MACK, Associate Judge (concurring in the result):

While I concur in the result reached by the court, I do not join in Part III of the opinion.  There, the majority, asked only to examine the propriety of the trial court's conclusion with regard to the application of sanctions under the Jencks Act, examines first the premise (unquestioned by the appellant, the government, or the trial court) that the police notes here were subject to production under the Act. Going back to the literal language of the Act which it terms "unambiguous",[1] virtually ignoring established principles of a dozen or more cases construing that language,[2] and lifting excerpts from a recent

27.  *See also* note 8, *supra.*

1.  I question how this language, which has been the subject of so much litigation, could be termed "unambiguous".

2.  *See, e. g., Moore v. United States,* D.C. App., 353 A.2d 16 (1976); *Banks v. United*

*States,* D.C.App., 305 A.2d 256, 258–59 (1973); *United States v. Harrison,* 173 U.S. App.D.C. 260, 524 F.2d 421, 422 n. 1, 433–34 (1975); *United States v. Maynard,* 155 U.S.App.D.C. 223, 229–30, 476 F.2d 1170, 1176–77 (1973); *United States v. Perry,* 153 U.S.App.D.C. 89, 97, 471 F.2d 1057, 1065

Supreme Court case out of factual context,[3] the majority reaches the startling (for me) conclusion that police investigative notes, such as those recorded on a 3 x 5 inch card, "would rarely, if ever, rise to a degree of completeness . . . sufficient to satisfy the rigorous prerequisites of the Act." *Ante,* at p. 700.

Only recently, this court, after thoroughly analyzing principles concerning the government's duty to preserve and produce police investigative notes, held that on-the-scene police notes containing a description of an assailant given by a victim are potential "statements" within the meaning of the Jencks Act. *Moore v. United States,* D.C. App., 353 A.2d 16 (1976). *See also Williams v. United States,* D.C.App., 355 A.2d 784 (1976); *Jackson v. United States,* D.C. App., 354 A.2d 869 (1976); *Jones v. United States,* D.C.App., 343 A.2d 346 (1975); *Hardy v. United States,* D.C.App., 316 A.2d 867 (1974); *Banks v. United States,* D.C. App., 305 A.2d 256 (1973). As this court emphasized in *Moore,* "'[t]he initial description of an assailant by the victim or other eyewitness is crucial evidence and the notes taken of that description should be kept and produced.'" *Moore v. United States, supra* at 19, quoting *United States v. Bundy,* 153 U.S.App.D.C. 191, 192, 472 F.2d 1266, 1267 (1972) (Leventhal, J., concurring).

I am concerned not only with the majority's pronouncements concerning police notes in general, but also with the gratuitous observation that the particular notes in this case may not have constituted a substantially verbatim statement[4] under subsection (e)(2) of the Jencks Act. *Ante,* at p. 699. I agree that the trial court in administering the Jencks Act should not overlook its initial obligation to determine whether given materials contain a substantially verbatim record of a witness' statement. As noted above, however, the government in this case did not question the fact that the lost notes were Jencks material, either at trial or in its brief on appeal. The trial court had no need to make an express finding that the lost material was a "statement" under subsection (e)(2) since the issue was never in dispute. It has been raised for the first time by this court.

Furthermore, the majority's conclusion that the police notes in this case did not constitute a substantially verbatim statement within the meaning of the Jencks Act is rather extraordinary in light of the officer's testimony that he wrote down substantially everything the complainant told him while describing her assailant.[5] *See Palermo v. United States,* 360 U.S. 343, 352–53, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). Surely, the determination of whether given

(1972); *United States v. Bundy,* 153 U.S. App.D.C. 191, 192, 472 F.2d 1266, 1267 (1972); *United States v. Barnes,* 150 U.S. App.D.C. 319, 322, 464 F.2d 828, 831 (1972) (Fahy, J., concurring), *cert. denied,* 410 U.S. 986, 93 S.Ct. 1514, 36 L.Ed.2d 183 (1973); *United States v. Hines,* 147 U.S.App.D.C. 249, 268–69, 455 F.2d 1317, 1336–37 (1972) (Bazelon, C. J., concurring in part and dissenting in part), *cert. denied,* 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972); *United States v. Bryant,* 142 U.S.App.D.C. 132, 140–42, 439 F.2d 642, 650–52 (1971). *See also Williams v. United States,* D.C.App., 355 A.2d 784, 788 (1976); *Jackson v. United States,* D.C.App., 354 A.2d 869, 871 (1976); *Jones v. United States,* D.C.App., 343 A.2d 346, 351–52 (1975); *Hardy v. United States,* D.C.App., 316 A.2d 867, 871 (1974) (Gallagher, J., concurring); *Savage v. United States,* D.C.App., 313 A.2d 880, 883–84 (1974); *United States v. Clemons,* 144 U.S.App,D.C. 235, 239, 445 F.2d 711, 715 (Bazelon, C. J., con-

curring), *cert. denied,* 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971).

3. *Goldberg v. United States,* 96 S.Ct. 1338 (1976).

4. I cannot agree that a police officer is unable or unlikely to record verbatim at least a portion of a witness' on-the-scene statement. "[I]t would seem only reasonable that specific words of description would be written down in the course of even the roughest note-taking." *United States v. Hines, supra* at 268, 455 F.2d at 1336 (dissent).

5. The officer stated that he wrote down what the complainant told him and that the only thing he left out was a reference to the assailant's sideburns which the complainant had tried to describe with hand motions. Thus, if the notes were sketchy in nature, so also was the description provided by the complainant.

materials constitute a "statement" does not turn on whether they were recorded on a 3 x 5 card. In my opinion, the trial court quite properly considered the notes in question·to be subject to the production requirement of the Jencks Act and determined that a sanction for their nonproduction was unnecessary because the substance of the statement had been incorporated into another document, a PD Form 251, which had been made available to defense counsel.[6] I would affirm solely on the ground that appellant suffered· no prejudice from nonproduction of the "statement".

---

6. *See Moore v. United States, supra* at 18–19; *Johnson v. United States,* D.C.App., 322 A. 2d 590 (1974); *Banks v. United States, supra* at 258.