**UNITED STATES of America, Plaintiff,**

**v.**

**Samuel Arthur BISHOP and Powan Kumar Dhandari, Defendants.**

**No. 82–CR–2.**

United States District Court,
N. D. New York.

May 4, 1982.

George H. Lowe, U. S. Atty., Syracuse, N. Y., for plaintiff.

Paul V. French, Albany, N. Y., for defendant Samuel Arthur Bishop; George A. Yanthis, Asst. U. S. Atty., Albany, N. Y., of counsel.

Peter M. Margolius, Catskill, N. Y., for defendant Powan Kumar Dhandari.

## MEMORANDUM–DECISION AND ORDER

MINER, District Judge.

By indictment filed on January 7, 1982, the defendants were charged with bringing into the United States eleven aliens, citizens of Guyana, not duly admitted and not lawfully entitled to enter this country, in violation of 8 U.S.C. § 1324(a)(1) (Counts II–XI). By the same indictment, defendants were charged with conspiracy to commit these same offenses, in violation of 18 U.S.C. § 371 (Count I). Before the Court are motions by the defendants to suppress documentary evidence seized from the defendants immediately following their arrest, as well as evidence of their identification. Additionally, defendant Dhandari moves to suppress certain statements given to agents of the U. S. Border Patrol.[1]

### I.

### FACTUAL FINDINGS

On December 22, 1981, Border Patrol Agent Tripi of the Rouses Point station received a telephone call from Immigration Inspector Moody of the Port of Entry, Champlain, New York, advising that certain information of interest had become available. Tripi proceeded to the Port of Entry, where Moody told him about a report he had received from Canadian immigration authorities at Black Pool, Quebec, Canada, north of Champlain. According to the information received, two subjects, later identified as the defendants, had been detained by Canadian authorities in connection with their application for admission into Canada. Defendant Bishop was known to Agent Tripi, who had fingerprinted him in connection with a previous arrest by agents of the Rouses Point Station for alien smuggling. Inspector Moody also reported that a slip of paper, containing geographical reference points in the Champlain area, had been taken from the person of Dhandari by the Canadian officials, who had given Moody a partial list of the reference points by telephone. Later that day, Agent Habid, another border patrol officer from Rouses Point, went to the immigration office at Black Pool and obtained a photocopy of the list of reference points taken from defendant Dhandari.[2]

A decision thereupon was made to patrol the Champlain area in the vicinity of the reference points, and surveillance by Agents Ward, Dixon and Tripi was main-

---

1. Hearings on these motions were held on February 26, 1982 and March 5, 1982. Testimony was given by Thomas McGrath, Border Patrol Agent; Richard P. Corcoran, Criminal Investigator, U. S. Border Patrol; defendant Powan Dhandari; Robert Tripi, Border Patrol Agent; and defendant Samuel Bishop.

2. Exhibit 4.

tained for possible alien smuggling in the area during the remainder of the evening. The general location, rural in nature, sparsely populated, with open fields and wooded areas, had been the scene of attempts to smuggle aliens from Canada on several occasions in the past. The ground in the area was covered by a substantial amount of snow. The surveillance produced no results on December 22 and was resumed on the evening of December 23, 1981, with Agents Tripi and Ward patrolling in one radio-equipped car and Agent Dixon patrolling in another. The radios permitted communication between the vehicles at all times. At about 8:00 p. m., Tripi and Ward were advised by Agent Dixon that a maroon station wagon, bearing Ontario license plates, was parked at the Chalet Motel, one of the reference points obtained the previous day. While proceeding to this location, Tripi and Ward learned that Agent Dixon had lost contact with the station wagon after a stop at the Mobil Gas Station, another reference point listed on the paper taken from Dhandari.

Thereafter, Agent Dixon took up his patrol in the area of the west access road in Champlain. Agents Ward and Tripi established their patrol on Perry Mills Road, proceeding in a westerly direction in the vicinity of the building variously described as a power station or pump house, another location found on the list of reference points obtained by the officers. This building is 50–60 feet from the road, apparently houses electric power or telephone lines serving the Village of Champlain, and is approximately one mile from the international boundary. As the agents passed the pump house, they observed a vehicle parked at that location, pointed in an easterly direction, with headlights on. They proceeded to Missile Base Road, where they took up a surveillance of the pump house location at about 8:15 p. m. However, they were unable to see the lights of the vehicle under surveillance from this point, and Agent Tripi, dressed in plain clothes, was dropped off approximately 100 feet east of the vehicle

under observation in order to pass on foot and obtain whatever information was available concerning the vehicle. Agent Tripi, equipped with a walkie-talkie, passing within 20 feet of the parked automobile, observed a short, stocky individual [3] get out of the vehicle, stop, and get back in. Tripi continued to walk in an easterly direction along Perry Mills Road, finally taking up surveillance at a mobile home 125–150 yards east of the parked automobile, a point from which he could see the taillights of the automobile. About 15 or 20 minutes later, Tripi was informed by radio that the vehicle was registered to defendant Dhandari, a resident of Toronto.

Approximately 25 or 30 minutes after Agent Tripi took up his post near the mobile home, an individual was observed running from the woods across the road in the vicinity of the pump house and vehicle under observation. A group of 8 people, according to Tripi's estimate, followed the first individual at a distance of about 10 feet. These people also ran across the road. Shortly thereafter, the headlights of the vehicle under observation were turned on and the vehicle proceeded in an easterly direction. Agent Tripi advised the other agents of these developments by radio, and arrangements were made for Agent Ward to pick up Agent Tripi, for Agent Dixon to stop the vehicle as it proceeded east, and for Agents Tripi and Ward to follow and assist Dixon. The vehicle was stopped, according to this plan, when Dixon blocked the vehicle with his automobile. The other agents converged on the scene at approximately the same time. The driver, defendant Bishop, whom Agent Tripi recognized, and the passenger, defendant Dhandari, were taken from the vehicle and "frisked." A search of the vehicle for illegal aliens and documents produced nothing. It was then determined that a formal arrest of the defendants would be made. When handcuffs were being applied to the defendants, it was observed that the legs of defendant Bishop's trousers were wet from the knees

**3.** This individual later was identified as defend- ant Dhandari.

down.[4] The Agents proceeded to the pump house with the defendants and found 10 illegal aliens there.

The defendants eventually were transported to the Rouses Point Station, where defendant Dhandari was placed in the office of the Patrol Agent in charge. After being given Miranda warnings, and after acknowledging the receipt of these warnings in writing (Exhibit 1), Dhandari was interviewed by Agent McGrath for approximately 2 hours, commencing at about 10:20 p. m. Although he first denied any participation, Dhandari eventually gave an oral statement describing the entire modus operandi of the alien smuggling scheme. He refused to give a written statement until he had an opportunity to consult an attorney. He was permitted to call his wife, was offered coffee and cigarettes, and told McGrath that he had been treated well. He was offered a telephone book and advised that he could call an attorney. On the following day, December 24, 1981, defendant Dhandari made another statement to Criminal Investigator Corcoran while being transported from the Magistrate's office to the penitentiary at St. Albans. The statement was made when Inspector Amott went to a store to make some food purchases for the investigators and Dhandari. Corcoran remained in the car with Dhandari, who volunteered the information that his job was only to drive the aliens to the border and pick them up on the other side.

## II.

## DISCUSSION

 Border patrol agents are vested with a statutory authority to effect arrests in the performance of their duties. 8 U.S.C. § 1357. To satisfy fourth amendment requirements that a lawful arrest must be predicated upon probable cause, it has been established that a person of reasonable caution must be justified in believing that the person to be arrested has committed, is committing, or is about to commit a crime. *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1963); *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949); *Carroll v. United States*, 267 U.S. 132, 161–162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). Reasonable restraints short of arrest, however, are allowed for the purpose of inquiry and identification on the basis of reasonable and articulable suspicion. *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Accordingly, where such a basis exists, roving border patrols are authorized to stop vehicles near the border for the purpose of questioning occupants about their citizenship and immigration status, even in the absence of probable cause to search or arrest. *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Moreover, neither probable cause nor reasonable suspicion is necessary for the search of a vehicle at the border or its functional equivalent, since such searches are permitted under the general authority of the United States to ensure the integrity of its borders. *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977). The concept of "border" being an elastic one, border searches have been allowed at various distances from the border itself. *United States v. Ajlouny*, 629 F.2d 830, 834 (2d Cir. 1980), *cert. denied*, 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981); *see United States v. Prix et al.*, 672 F.2d 1077 (2d Cir. 1982).

 Applying the foregoing rules, especially the guidelines established in *Brignoni-Ponce*, to the facts found herein, it is clear that the border patrol agents had a reasonable and articulable suspicion to stop the defendants when they did. The following facts, known to the agents at the time of the stop, are most significant in this regard:

**4.** Snow had fallen earlier in the day and there was testimony that there was approximately 2 feet of snow on the ground when the arrest was made.

the vehicle stopped was registered to defendant Dhandari, who had entered Canada the previous day with defendant Bishop, a known alien smuggler; the geographical references found by the Canadian authorities on Dhandari's person all pertained to the immediate area under surveillance; the vehicle was parked earlier that day in front of the Motel listed as a reference point, and then proceeded to Burl's Mobil Station, another reference point; a large number of persons were seen running from the woods, through the snow, at the location of previous alien smuggling attempts; the vehicle proceeded down the road immediately thereafter, having previously been stopped with lights off in front of the pump house, a supposedly deserted building; and the occupant of the vehicle behaved in a suspicious manner by getting out of the car and returning to it while parked in front of the pump house.[5]

After the stop, the agents found defendant Bishop, the known alien smuggler, and the man who accompanied Dhandari into Canada, in the driver's seat of the car. They then observed that Bishop's trousers were wet from the knees down, suggesting that he had come through the snow in the woods. Although no inquiry was made after the stop, these additional observations, coupled with the articulable facts forming the basis for the original stop, constituted a totality of probable cause for the arrest then and there made. *United States v. Rosario*, 543 F.2d 6, 8 (2d Cir. 1976); *United States v. Avalos-Ochoa*, 557 F.2d 1299, 1303 (9th Cir. 1977); *Raffone v. Adams*, 468 F.2d 860, 866 (2d Cir. 1972). This conclusion is not negated by the agents' lack of knowledge, at the time of the arrest, that the persons who ran through the woods were in fact the Guyanese aliens they turned out to be. *Adams v. Williams*, 407 U.S. 143, 148–149, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972); *United States v. Webb*, 623 F.2d 758, 761 (2d Cir. 1980); *United States v. Rodriguez*, 532 F.2d 834, 838 (2d Cir. 1976).

It follows from the foregoing that the evidence [6] seized from the defendants immediately after arrest was properly taken as incident to a lawful arrest and should not be suppressed. *Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). It also follows that the statements given by defendant Dhandari shortly after his arrest should not be suppressed as a confession tainted by an arrest without probable cause. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The Court rejects as incredible the testimony of defendant Dhandari that he was not properly afforded the *Miranda* warnings and that his confession was coerced by threats of physical harm and deprivation of insulin.[7] The statement given by Dhandari while being transported to the penitentiary was spontaneous and unsolicited. *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). With respect to the claim that there was an improper confrontation between the aliens and the defendants at the pump house following the arrest, the Court accepts the contention of the Government that there was no such confrontation.[8] The position taken by the defendants in this regard is moot in any event, since the Government has represented to the Court that no "show-up" identification testimony will be offered. *Cf. Unit-*

---

5. Since the stop was made approximately one mile from the Canadian border, it was also justifiable for the purpose of a border search. *United States v. Prix, et al., supra.*

6. A sheet of paper with a list of names and telephone numbers and certain airline tickets and transfers were seized from defendant Bishop. A sheet of paper containing directions to the pump house was seized from defendant Dhandari.

7. Dhandari also claimed that he made no incriminating statement whatsoever.

8. Although Agent Tripi testified that the defendants were returned to the pump house after the arrest, he did not testify as to any confrontation. The contrary testimony of defendant Bishop is rejected.

*ed States v. McCoy*, 475 F.2d 344, 347 (D.C.
Cir.1973); *United States v. Hines*, 455 F.2d
1317, 1323 (D.C.Cir.1972), *cert. denied*, 406
U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675.

### III.

The motions of the defendants are denied
in all respects.

It is so Ordered.